*Bennett Frankel, et al. v. Casey Lou Deane*, No. 43, September Term, 2021.  Opinion by Gould, J.

EXPERT TESTIMONY – MEDICAL MALPRACTICE

The trial court's admission or exclusion of expert medical testimony is reviewed on an abuse of discretion standard.  When assessing the admissibility of such testimony, the court may not resolve disputed material facts or witness credibility issues; such issues are for the jury to decide.  The court abuses its discretion when it excludes testimony based on the court's factual determinations on genuinely disputed issues.

EXPERT TESTIMONY – MEDICAL MALPRACTICE

Under *Meda v. Brown*, 318 Md. 418 (1990), in a medical malpractice case, if the expert cannot ascertain the precise cause of the injury, inferential reasoning is permissible to establish the elements of breach and causation so long as each inference is supported by expert testimony.

Circuit Court for Calvert County
Case No.: C-04-CV-18-000396
Argued: March 7, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 43

September Term, 2021

_____

BENNETT FRANKEL, ET AL.

v.

CASEY LOU DEANE

_____

\*Getty, C.J.
Watts
Hotten
Booth
Biran
Gould
McDonald, Robert N. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Gould, J.
Watts, J., dissents.

_____

Filed: August 25, 2022

\*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while being an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

## BACKGROUND

### A

This is a medical malpractice case arising out of the removal of Casey Lou Deane's lower and upper wisdom teeth by Dr. Bennett Frankel. Dr. Frankel performed the surgery on January 14, 2016.[1] Ms. Deane signed consent forms and was, according to Dr. Frankel's medical notes, "told of possible complications, mainly pain, burning, paresthesia lower lip, chin, tongue[.]"

When Ms. Deane awoke after the surgery, she was in pain and couldn't speak or feel her tongue. She was told to go home and rest and was assured that her condition would improve once the anesthesia wore off. But that did not happen.

Ms. Deane had a follow-up appointment with Dr. Frankel several days after the surgery. Dr. Frankel's notes from the visit reflect that Ms. Deane complained of pain, paresthesia, and tingling on the front third of both sides of her tongue. Ms. Deane recalled being told "to give it more time to heal[,]" but denied reporting any improvement.

Dr. Frankel's notes also indicate that Ms. Deane had a follow-up appointment scheduled for one week later, which Ms. Deane did not attend. Regarding that appointment, the notes state, "patient's complaints getting better" and "not coming back." Ms. Deane recalled no conversation with anyone from Dr. Frankel's office about the follow-up appointment. She did recall, however, not wanting to go back to Dr. Frankel

---

[1] Because this is an appeal from a summary judgment, we recite the facts in the light most favorable to the non-moving party, Ms. Deane.

because she could not feel her tongue, and yet he told her that she was "okay" and assured her that in time the problems would resolve. She testified, "[s]o I think I was just done."

Several months after the surgery, Ms. Deane's symptoms continued to show no improvement, so she called Dr. Frankel's office and scheduled an appointment with a different doctor, Dr. Clay Kim for April 18, 2016.

What transpired at Ms. Deane's appointment with Dr. Kim is in dispute. Dr. Kim's progress notes state that Ms. Deane complained that her tongue was numb but also stated that she was "getting better and still tingling" and that her "whole tongue [was] not numb anymore," and that ". . . [n]ow only [the] right anterior tongue is numb." The notes also reflect that Dr. Kim examined her mouth and conducted some neurosensory tests, stating, "right anterior 2/3 with mild pain perception, direction, and soft touch sensation intact[.]" Dr. Kim diagnosed a "likely neuropraxia injury" and noted that referral to a "neurologis[t]" might be necessary, but that he recommended "observation for now" and that the "[p]atient will schedule for the above procedure[s]."[2] The notes do not reflect that Dr. Kim tested Ms. Deane's sense of taste or her reaction to hot or cold stimuli.

Ms. Deane maintains that, contrary to Dr. Kim's notes, she told him that her tongue was numb on *both* sides of the front of the tongue, that it was difficult to talk and eat, and that she was experiencing pain, throbbing, and tingling. She recalled that Dr. Kim poked her tongue with something, but did not recall him mentioning the possible need to see a nerve specialist.

---

[2] It's not clear to which procedures Dr. Kim's notes were referring.

2

Roughly six months after the surgery, Ms. Deane still could not feel her tongue, which prompted her to do some research. She found information on bilateral lingual nerve injuries which seemed to produce the same symptoms as those she had been experiencing. Lacking dental insurance, Ms. Deane did not follow up with another oral surgeon. About two years after her surgery, she decided to call a lawyer, who, in turn, referred her to Dr. Richard Kramer, a dentist who was board-certified as an oral and maxillofacial surgeon.

Dr. Kramer's practice included third molar extractions and diagnosing nerve injuries. After conducting a series of sensory tests on Ms. Deane, Dr. Kramer prepared and sent a report with his findings to her attorney. His report said: "[t]he injury here is likely a bilateral neurotmesis."[3] Dr. Kramer also opined that, due to the time between the date of the surgery and his evaluation, the injury was permanent.

**B**

In August 2018, Ms. Deane filed a malpractice claim against Dr. Frankel and Southern Maryland Oral and Maxillofacial Surgery, P.A. ("Southern"), the practice that employed Dr. Kim. Ms. Deane alleged that she suffered permanent loss of feeling in her tongue because Dr. Frankel severed the lingual nerve while extracting her wisdom teeth,

---

[3] "Neurotmesis is a complete transection of a peripheral nerve. The severity of peripheral nerve injury can be classified as neurapraxia, axonotmesis, or neurotmesis. Neurotmesis will produce complete sensory and motor deficits to the skin and muscles innervated by the injured nerve." *See* Alexjandro J. Matos & Orlando De Jesus, *Neurotmesis*, NAT'L LIBR. OF MED. (last visited Aug. 12, 2022), https://www.ncbi.nlm.nih.gov/books/NBK559108/#:~:text=Neurotmesis%20is%20a%20 complete%20transection,innervated%20by%20the%20injured%20nerve.

3

and because Dr. Kim failed to promptly refer her to a nerve specialist. Ms. Deane subsequently amended her complaint to add Dr. Kim as a defendant.[4]

C

Ms. Deane designated two experts: (1) Dr. Kramer, to provide expert testimony on the nature and extent of her alleged injury; and (2) Armond Kotikian, D.D.S., M.D., a board-certified dentist in oral and maxillofacial surgery, to testify on standard of care and causation.

***Dr. Kramer***

Dr. Kramer testified at his deposition that the standard of care for diagnosing nerve injuries was set forth in the "Nerve Evaluation Protocol 2014" from the California Association of Oral and Maxillofacial Surgeons (the "2014 Protocol"). The 2014 Protocol recommends a four-part test for providing "a framework upon which evaluation and treatment options could be based." Dr. Kramer routinely used that test in his practice to diagnose lingual nerve injuries, including with Ms. Deane.

Dr. Kramer explained that he "performed pressure, two-point discrimination, taste, and sensation of sharp" on Ms. Deane. He acknowledged that the test was partly based on the subjective reporting of his patients but stated that he tries "to make it as objective . . . as [he] can."

With Ms. Deane, he used the fluff of a wooden Q-Tip to determine if she could feel a light touch, a broken end of the Q-Tip to test if she could feel a sharp touch, and a metric

---

[4] Dr. Frankel, Dr. Kim, and Southern are collectively referred to herein as the "doctors" or "petitioners."

gauge to measure the distance at which she could distinguish touching sensations in two places. He observed that Ms. Deane had no feeling and no ability to discern feeling in two places on the front two-thirds of both sides of her tongue. Dr. Kramer also conducted a temperature test on Ms. Deane's tongue, and again, "[t]here was no response."

In addition, Dr. Kramer performed a taste test with a local anesthetic, which is known to be bitter. He put the anesthetic in several different places on Ms. Deane's tongue, including at the back. Ms. Dean reported no taste in the front bilateral parts of her tongue. As to the subjective nature of the taste test, Dr. Kramer explained that, for most people, "when you do that, if they can taste it, you can look right at them and know they're tasting it."

As noted above, Dr. Kramer opined that "[t]he injury here is likely bilateral neurotmesis," or, as described in his deposition, a "complete transection of the lingual nerve bilaterally[.]" His report also stated that Ms. Deane "will experience no further improvement in her condition[,]" and that the injury was permanent. Dr. Kramer gave two reasons for his opinions: (1) the neurosensory tests showed that Ms. Deane had no feeling in the area of her tongue in front of the wisdom teeth; and (2) the fact that Ms. Deane had no sensation in her tongue two years after the injury meant that the lingual nerve had been severed because otherwise, he would have expected to see some improvement due to nerve regeneration.

Dr. Kramer did not review either Dr. Frankel's or Dr. Kim's notes prior to his examination. When asked if a neurosensory exam three months after surgery would have been pertinent to his opinions on nerve injury in this case, Dr. Kramer said "[p]ending the

5

outcome of that exam. Yes." He then explained that "[b]y example, . . . if someone did an exam of her at three months and she had a normal sensation, that would be quite pertinent to the outcome . . . [b]ecause she didn't have normal sensation when I saw her nearly two years after the injury." He testified that seeing improvement three months after surgery, as reported by Dr. Kim, was inconsistent with the conclusions he reached from his examination two years after surgery because if the symptoms had been improving at three months, Ms. Deane's condition would not have subsequently deteriorated. Dr. Kramer opined that the only diagnosis consistent with Ms. Deane's persistent loss of taste sensation or feeling in her tongue for two years was a complete severance of the lingual nerve.

### Dr. Kotikian

Dr. Kotikian was designated to testify that "Ms. Deane has developed full anesthesia of her tongue, bilaterally and a likely severance of her lingual nerves, bilaterally, following the extraction of [the lower wisdom teeth] by Dr. Bennett F. Frankel[.]" In addition, he would testify that: (1) the injury "likely occurred while the third molar in question was being sectioned and the bur traversed the lingual plate causing the lingual nerve to be severed"; (2) the injury could have been avoided by placing "a retractor or a periosteal elevator . . . between the lingual plate and periosteum during the time of sections and/or adequate buccal and distal troughs . . . around the teeth"; and (3) the failure to take either precautionary step deviated from the standard of care in oral surgery practice and caused Ms. Deane's injuries. Further, Dr. Kotikian would testify that "if the teeth [had not been] transected, then the surgeon cut the flap too widely and outside the intended surgical field." According to Dr. Kotikian, "each is a deviation from the standard of care."

6

Dr. Kotikian was also designated to testify that Dr. Kim should have recommended that Ms. Deane take steroids and should have referred her to a neurosurgeon "or nerve repair specialist[,]" as such "treatment . . . is most effective when performed within the first 1-3 months post injury."

At his deposition, Dr. Kotikian testified that he based his opinion on the totality of Dr. Kramer's diagnosis, Ms. Deane's testimony concerning her symptoms, relevant scientific literature, and his own experience avoiding permanent lingual nerve injuries by using a retractor/elevator or drilling adequately around the buccal side of the teeth.

Dr. Kotikian explained that he was skeptical about the notes from Drs. Frankel and Kim because it was not possible that Ms. Deane had an improvement in sensation, given that Dr. Kramer's tests found that she exhibited symptoms of total nerve severance, and that nerves do not degenerate over time; if anything, they improve. As to whether Ms. Deane could have been lying to Dr. Kramer in response to the tests he performed, Dr. Kotikian expressed doubt, stating: "when we do these examinations, we're actually poking and prodding, so if they're not feeling anything, it's very obvious because if we stick a needle in there, they'll jump if they have sensation."

Dr. Kotikian further explained that although a lingual nerve injury is a known risk of wisdom teeth extraction, such injuries are usually temporary, whereas a complete severance of the nerve is permanent. And, he explained, an oral surgeon could do everything correctly and still cause a temporary nerve injury, but could not completely sever the nerve without deviating from the standard of care. According to Dr. Kotikian, that's because lingual nerve severance means that the lingual plate must have been crossed

7

in the performance of the extraction, or a retractor was not used to protect the nerve from improper drilling.

**D**

Dr. Frankel and Southern both moved for summary judgment, which was, for all intents and purposes, later adopted by Dr. Kim after he was added as a defendant.[5] Petitioners argued that there was "no direct or physical evidence of injury or medical circumstances sufficient to allow an expert opinion 'inference' that surgical negligence occurred in this matter[.]"  Relying on this Court's opinion in *Meda v. Brown*, 318 Md. 418 (1990), they contended that inferences of negligence and causation require "sufficient direct and physical evidence[,]" and that "Ms. Deane's self-serving statements made during litigation and accusing both Dr. Kim and Dr. Frankel of fabricating her reports of improved sensation do not create a dispute of fact sufficient to overcome summary judgment in this matter."

Dr. Frankel further argued that under *Meda*, the "evidence must show the injury is not something that happens in the absence of surgical negligence[,]" and that the risk of "[t]emporary and/or permanent lingual nerve injury during the extraction of wisdom teeth is well known . . . and . . . does happen when appropriate and reasonable surgical techniques are used."  Dr. Frankel contended that "Dr. Kotikian also testified that lingual nerve injury is a recognized and material risk" of the surgery performed on Ms. Deane.  Dr. Frankel argued that "[t]here is absolutely no direct or physical evidence of any injury or abnormal

---

[5] The parties treated Dr. Kim as a party defendant during the summary judgment proceedings, even though Ms. Deane did not add him as a defendant until after the hearing.

trauma to [Ms. Deane's] anatomy" and that the "entire alleged 'inference' that negligence occurred is itself based on an invalid and/or speculative 'inference' that a specific injury happened."

Putting it less charitably, Dr. Frankel averred that "the entire factual basis of [Ms. Deane's] case depends on [her] experts' rewriting the medical history pursuant to the self-serving statements of [Ms. Deane] made for purposes of litigation." Thus, he contended that the expert testimonies of Drs. Kramer and Kotikian were inadmissible under *Meda*, the *Frye-Reed* standard, and Rule 5-702, and that without expert testimony, Ms. Deane could not present a prima facie case of negligence.

In response, Ms. Deane argued, among other things, that genuine disputes of material facts precluded summary judgment, particularly regarding the reliability of Dr. Kim's and Dr. Kramer's assessments.

### Summary Judgment Hearing

The court held a hearing on the summary judgment motions on August 7, 2019. As the arguments progressed, the court determined that a *Frye-Reed* hearing was necessary to consider the admissibility of the testimony of Ms. Deane's experts. Although the court made a tentative decision to grant summary judgment in favor of Southern and Dr. Kim on the claim that Dr. Kim negligently failed to refer Ms. Deane to a neurosurgeon, the court deferred ruling on the remaining issues pending the *Frye-Reed* hearing.

### The Frye-Reed Hearing

In advance of the *Frye-Reed* hearing, petitioners submitted a bench memorandum, contending that the court should exclude Ms. Deane's expert witnesses based on *Frye-Reed*

9

principles. Petitioners argued that: (1) Ms. Deane's theory of liability was inadmissible because the injuries she incurred were known risks of her procedure that could occur without negligence; (2) Dr. Kotikian's testimony that she suffered "bilateral severed lingual nerve" damage was inadmissible because it was based on subjective complaints and not on exploratory surgery; and (3) Ms. Deane's experts' assertion that the standard of care required a lingual tissue retraction technique was inadmissible because that technique was not generally accepted as being beneficial. Petitioners supported their memorandum with Ms. Deane's consent form as well as scholarly articles on trigeminal nerve injuries following third molar removal, lingual nerve injuries and nerve damage, and micro neurosurgery of the lingual nerve.

Petitioners did not dispute that the sensory tests conducted by Dr. Kramer were generally accepted methodologies in the medical community, but instead argued that the diagnosis Dr. Kramer made from the test results was not a generally accepted conclusion. In other words, petitioners argued that there was an "analytical gap" between the tests administered by Dr. Kramer and the conclusions that he and Dr. Kotikian drew from them.[6]

Ms. Deane likewise filed a memorandum, which she supported with party and witness depositions, excerpts from the 2014 Protocol, scholarly articles on trigeminal nerve

---

[6] The phrase "analytical gap" refers to the concept discussed by the United States Supreme Court in *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), and adopted by this Court in *Blackwell v. Wyeth*, 408 Md. 575, 606-07 (2009). As explained in *Rochkind v. Stevenson*, 471 Md. 1 (2020), the analytical gap issue in *Blackwell* "was whether the *Frye-Reed* test applied 'to the analysis undertaken by an expert where the underlying data and methods for gathering this data are generally accepted in the scientific community but applied to support a novel theory' of medical causation." *Id.* at 17 (quoting *Blackwell*, 408 Md. at 596).

injuries and the accuracy of clinical neurosensory testing for nerve injuries, and a chapter from a textbook, Clinical Evaluation of Nerve Injuries.

Ms. Deane argued that *Frye-Reed* did not apply because the neurosensory testing technique that her expert utilized was not novel. Further, she contended that under Maryland Rule 5-702, her experts had sufficient factual support for their opinions, including deposition testimony, medical literature, applicable guidelines, medical records, clinical exercises, training, and education.

### *The Trial Court's Ruling*

On April 20, 2020, the circuit court issued a 97-page Memorandum Opinion and Order (the "memorandum order"), granting the summary judgment motions and dismissing Ms. Deane's complaint with prejudice as to all defendants. Rather than provide our own summary of the court's ruling, we shall refer to the court's summary set forth at the outset of its opinion:

> [T]his Court found herein, applying Maryland's *Frye-Reed* Standards, *Meda v. Brown*, 318 Md. 418, 428 (1990), and Maryland Rule 5-702 principles of law, that Dr. Kramer's 2018 opined conclusion as to the possible severance in 2016 is based primarily on his examination of Plaintiff almost two years after the fact, and on the Plaintiff's shaky, uncertain self-reporting to him then in 2018 without him having reviewed the professionally detailed notes and records of Dr. Frankel's and Dr. Kim's treatments and examination of Plaintiff, which this Court found met Maryland's *Frye-Reed* Standards of scientific, clinical, and analytical reliability as well as to be based on such requisite methodology as required therein. Thus, the Court further found herein that Dr. Kramer's opined conclusions at the time of his April 2018 examination of Plaintiff, which serve as the lynchpin for Dr. Kotikian's expert opinions of violations of standard of ordinary care by Dr. Frankel, Dr. Kim, and the Practice, fail to meet, directly or inferentially, the Maryland *Frye-Reed*, *Meda*, and Maryland Rule 5-702 standards of scientific, clinical, and analytical reliability as well as to be based on such requisite methodology as required therein. That is so since Dr. Kramer's opinion failed to have

11

reviewed the professional and detailed notes and records of Dr. Frankel's and Dr. Kim's treatment and examination of Plaintiff and to have weighed and compared them against her uncertain versions of her treatment history with all of the Defendants, which failure he admits in his deposition may have changed his opined conclusion as to the acts and omissions of Dr. Frankel, Dr. Kim, and the Practice being professionally negligent. Nor was his opinion as to the lack of timely referral by Dr. Kim and the Practice constituting professional malpractice adequately supported by the medical authorities and studies relied upon by him. Thus, Dr. Kotikian's opinions of violations of the standard of ordinary care by Dr. Frankel, Dr. Kim, and the Practice, having been found to have been significantly based on Dr. Kramer's faulty opined findings and conclusions and unsupported by the medical authorities and studies relied upon by Dr. Kotikian are found on the record herein not to comply with Maryland *Frye-Reed*, *Meda*, and Maryland Rule 5-702 standards of scientific, clinical, and analytical reliability as well as not to be supported by such requisite methodology. Accordingly, Dr. Kotikian's opinions as to violations of the ordinary standard of dental care as to all Defendants are not admissible in this matter, and therefore, *inter alia*, there is not found ultimately to exist a genuine dispute of material facts, such that Plaintiff's claims do not survive Summary Judgment with respect to all Defendants.

Having found as key facts that the Plaintiff's failure to attend follow-up appointments as recommended and instructed prevented a timely referral to a nerve repair specialist for microneuroexploratory surgery within the purported one to three month window for Dr. Frankel or the outer limit of the purported three to six month window for Dr. Kim or the Practice to do so, the Court determined affirmatively that there was no genuine dispute of material fact that none of the three Defendants committed negligence as alleged for such a failure to so refer. Alternatively, it found that the Plaintiff committed contributory negligence by unjustifiably failing to attend follow-up appointments with all three Defendants as recommended, and that none of the Defendants committed negligence by failing to follow-up with a letter or communication for her to seek such a referral. Thus, the Plaintiff cannot succeed on her claims at trial and is barred from recovery as matter of law, and, accordingly, the Court grants Summary Judgment in favor of the Defendants.

**E**

Ms. Deane noted a timely appeal. In an unreported opinion, the Court of Special

Appeals reversed, finding that the trial court erred as a matter of law. *Deane v. S. Md. Oral*

*& Maxillofacial Surgery, P.A.*, No. 0218, Sept. Term 2020, 2021 WL 3523939 (Aug. 11, 2021). The Court disagreed with the trial court that Dr. Kramer's failure to review the notes of Drs. Frankel and Kim rendered his opinions unreliable. *Id.* at *7. According to the Court, such failure would go to the weight of his testimony, not to its admissibility. *Id.*

The Court also disagreed with the trial court's interpretation that, pursuant to *Meda*, Dr. Kotikian's opinions were inadmissible because they failed to meet the standard for inferences of negligence. *Id.* at *9.

Finally, the Court ruled that the court erred in determining that Ms. Deane was contributorily negligent. *Id.* at *10.

The doctors petitioned this Court for a writ of *certiorari*, which we granted. *Frankel v. Deane*, 476 Md. 416 (2021). They present three questions for our review, which we consolidated and re-phrased as follows:[7]

---

[7] The questions as presented by petitioners were:

1. Did the CSA err by neither (1) applying the *Rochkind* [*v. Stevenson*, 471 Md. 1 (2020)] factors when reversing the trial court's preclusion of expert testimony or (2) remanding the case to the circuit court to apply the *Rochkind* factors?
2. Did the CSA erroneously hold that the trial court abused its discretion by precluding expert testimony under *Meda v. Brown*, if the opinions and inferences were speculative unless the expert could reliably opine that the injury ordinarily would not occur without negligence?
3. Did the CSA erroneously hold that the trial court abused its discretion by precluding expert testimony after finding that Respondent's experts had applied unsound reasoning and methodology to conclude that bilateral nerve severing injuries occurred?

1. Did the Court of Special Appeals erroneously hold that the trial court abused its discretion by precluding the expert testimony of Respondents' experts?

2. Did the Court of Special Appeals err by neither (1) applying the *Rochkind* factors when reversing the trial court's preclusion of expert testimony or (2) remanding the case to the circuit court to apply the *Rochkind* factors?

## DISCUSSION

To prevail in a medical malpractice negligence action, a plaintiff must prove four elements: "(1) the defendant's duty based on an applicable standard of care, (2) a breach of that duty, (3) that the breach caused the injury claimed, and (4) damages." *Am. Radiology Servs., LLC v. Reiss*, 470 Md. 555, 579 (2020). "Because of the complex nature of medical malpractice cases, . . . [plaintiffs must present expert testimony] to establish breach of the standard of care and causation." *Stickley v. Chisholm*, 136 Md. App. 305, 313 (2001) (citation omitted).

Maryland Rule 2-501(f) provides that "[t]he court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Thus, summary judgment is appropriate if the plaintiff fails to come forward with admissible expert testimony on standard of care, breach, and causation. *See Rodriguez v. Clarke*, 400 Md. 39, 72 (2007); *Puppolo v. Adventist Healthcare, Inc.*, 215 Md. App. 517, 534 (2013). We review the trial court's grant of summary judgment de novo. *Webb v. Giant of Md., LLC*, 477 Md. 121, 347 (2021).

### A

14

To be admissible, expert testimony must satisfy the requirements of Maryland Rule

5-702, which provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if
> the court determines that the testimony will assist the trier of fact to
> understand the evidence or to determine a fact in issue. In making that
> determination, the court shall determine
>
> > (1) whether the witness is qualified as an expert by knowledge, skill,
> > experience, training, or education,
> > (2) the appropriateness of the expert testimony on the particular
> > subject, and
> > (3) whether a sufficient factual basis exists to support the expert
> > testimony.

Medical negligence may be proven with both direct and circumstantial evidence.

*Meda*, 318 Md. at 428. In *Meda*, this Court held that a *prima facie* case of medical

negligence may be proven by "proof of circumstances from which its existence may be

inferred[,]" provided that the inferences from such circumstances were drawn by experts

"armed with their fund of knowledge[.]" *Id.* at 428 (citation omitted).

The factual basis for an expert's opinion can come from "facts obtained from the

expert's first-hand knowledge, facts obtained from the testimony of others, and facts

related to an expert through the use of hypothetical questions." *Sippio v. State*, 350 Md.

633, 653 (1998). In addition, experts are permitted to "express an opinion based upon facts

assumed but not in evidence when the question is asked, if such facts are later proved in

the case." *Mangione v. Snead*, 173 Md. 33, 42 (1937). This applies to disputed facts as

well. As this Court explained,

> Under such circumstances, the proper way to submit a hypothetical question
> is to ask the witness to presume the truth of certain facts as if they were not
> the subject of dispute. These may still be contested in actuality but the

15

inquiry is proper as long as there is evidentiary support for the facts which the expert is told to assume the veracity of and evaluate in rendering his opinion. Of course, any assumption made must be grounded on a fair summation of the material facts in evidence and those material facts must be sufficient in scope for the witness to formulate a rational opinion. In such a situation the jury is aware of the premise upon which the opinion is based and can determine whether that assumption was valid. If it is not, the opinion of the expert is disregarded.

*Kruszewski v. Holz*, 265 Md. 434, 445 (1972).

Admissibility rulings under Maryland Rule 5-702 are reviewed under an abuse of discretion standard. A ruling under Rule 5-702

may be reversed on appeal if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion. Additionally, we will not affirm a decision within the discretion of the trial court if the judge acts in an arbitrary or capricious manner or beyond the letter or reason of the law.

*Rochkind* , 471 Md. at 11 (cleaned up).

Until this Court's decision in *Rochkind*, Maryland adhered to the *Frye-Reed* standard for the admissibility of expert testimony based on scientific principles.[8] *Id.* at 4-5. Under *Frye-Reed*, "prior to the admission of expert testimony based on the application of novel scientific techniques, the party seeking to use the expert testimony must establish that the particular methodology is valid and reliable." *Clemons v. State*, 392 Md. 339, 363 (2006). Over time, however, as Judge Adkins observed, the scope of the "general acceptance" standard, in practice although not expressly, has been expanded to include "testimony based on any scientific principle—new or old." *Savage v. State*, 455 Md. 138,

---

[8] *Frye-Reed* refers to the seminal case of *Frye v. State*, 293 F. 1013 (D.C. 1923), which articulated a standard for admissibility of novel scientific expert testimony, and *Reed v. State*, 283 Md. 374 (1978), which adopted the *Frye* standard in Maryland.

180 (2017) (Adkins, J., concurring). In addition, Maryland *Frye-Reed* jurisprudence expanded the general acceptance test to "not only to evaluate scientific methods, but also to assess scientific conclusions." *Id.* at 181 (Adkins, J., concurring). The standard of appellate review for *Frye-Reed* determinations is de novo. *Wilson v. State*, 370 Md. 191, 201 n.5 (2002).

## B

Ms. Deane built her case on the inextricably linked testimony of two experts. The opinions of both experts rested on the assumption of certain disputed facts. For example, Dr. Kramer assumed the truth of the following facts: (1) Dr. Kim's notes inaccurately reflected what Ms. Deane had reported to him; (2) Ms. Deane told Dr. Kim that she had experienced no improvement in her symptoms; and (3) Ms. Deane genuinely and truthfully answered Dr. Kramer's questions and responded to his sensory tests to the best of her ability. As set forth above, the record included testimony that supported each of these assumed facts.

The circuit court, however, found fault with Dr. Kramer's opinion, concluding that it was

> based primarily on his examination of Plaintiff almost two years after the fact, and on the Plaintiff's shaky, uncertain self-reporting to him then in 2018 without him having reviewed the professionally detailed notes and records of Dr. Frankel's and Dr. Kim's treatments and examination of Plaintiff, which this Court found met Maryland's *Frye-Reed* Standards of scientific, clinical, and analytical reliability as well as to be based on such requisite methodology as required therein.

Because of his failure to review the notes and records of Drs. Frankel and Kim, the court found that Dr. Kramer's conclusions "fail[ed] to meet, directly or inferentially, the

17

Maryland *Frye-Reed*, *Meda*, and Maryland Rule 5-702 standards of scientific, clinical, and analytical reliability as well as to be based on such requisite methodology as required therein."

The court did not explain, however, why it subjected the notes of Ms. Deane's treating physicians to a *Frye-Reed* analysis. The court also did not explain the basis on which it determined that those notes passed the *Frye-Reed* test or why Dr. Kim's sensory examination passed the *Frye-Reed* test but Dr. Kramer's sensory examination did not.

The circuit court improperly took sides in a credibility contest between Drs. Frankel and Kim on one hand and Ms. Deane on the other hand. Dr. Frankel's records indicate that Ms. Deane reported improvement of her symptoms—Ms. Deane denied reporting any improvement. Dr. Frankel's records regarding her missed follow-up appointment stated, "patient's complaints getting better" and that she was "not coming back[.]" Ms. Deane, however, testified that during that time, she was having the "same issues" and that her "tongue . . . never restored any feeling."[9]

---

[9] The circuit court described Ms. Deane's recollection of her post-op visits with Dr. Frankel as "sketchy." When first asked about the follow-up visit with Dr. Frankel, Ms. Deane initially didn't remember that visit or what was said during it. After further questioning, however, Ms. Deane's memory was refreshed somewhat, and although she did not recall details of what either she or Dr. Frankel said during that visit, she was adamant that she did not report any improvement, as reflected in her testimony:

> Q:     And you would not—that would include you do not have any recollection of whether or not you reported any improving to your numbness on the 19th?
>
> A:     No. But I didn't.

Dr. Kim's notes from Ms. Deane's appointment three months later likewise reflected that Ms. Deane had reported improvement in her symptoms, stating that she was getting better, still feeling some tingling and that only the right anterior portion of her tongue was numb. In contrast, Ms. Deane testified that she told Dr. Kim that both sides of her tongue were numb and that she reported pain, throbbing, and tingling.

Thus, the circuit court was confronted with medical records from Drs. Frankel and Kim that were disputed in multiple material respects by their patient. The conflicting evidence on these issues teed up a classic credibility contest for the jury—not the court— to resolve. By taking those factual issues away from the jury, the circuit court erred.

The circuit court also impermissibly gave petitioners the benefit of favorable inferences drawn from evidence susceptible to more than one interpretation. For example, the court stated that Dr. Kramer "admits in his deposition [that he] may have changed his opined conclusion as to the acts and omissions of Dr. Frankel, Dr. Kim, and the Practice

---

****

Q:    And now, --and then you said—you also specifically said you denied reporting any improvement to the symptoms?

A:    I did not report any improvement.

Q:    Sounds like now you have a pretty okay memory of that visit; is that fair?

A:    I just know that I didn't report any because there wasn't any.

Although Ms. Deane's credibility will have to be determined by the factfinder at trial, for summary judgment purposes, the circuit court should have credited Ms. Deane with the benefit of the doubt, not the other way around.

19

being professionally negligent" if he had been provided with their notes. The "admission"

by Dr. Kramer to which the court referred came in this exchange:

Q:     Okay. You have not reviewed any medical records of providers other than yourself in this matter?

A:     No, I have not.

Q:     Have you reviewed the medical records of Casey Deane, specifically, Clay Kim's neurosensory exam at three months postop?

A:     No.

Q:     Were you aware that such an exam exists?

A:     No.

Q:     Would that have been relevant to your opinions in this matter?

A:     I don't know.

Q:     Okay.

A:     I suppose it depends on what was in there.

Q:     Would a neurosensory exam at three months generally be pertinent to your opinions on nerve injury in this matter?

A:     Pending the outcome of that exam. Yes.

Q:     The results of that neurosensory exam at three months would be pertinent to the basis or concluding that Miss Deane does have a nerve injury; is that right?

A:     I'm not sure if I follow the way you're phrasing the question.

Q:     Sure.

A:     By example, however, if someone did an exam of her at three months and she had normal sensation, that would be quite pertinent to the outcome.

Q:     And why would that be quite pertinent?

20

A:     Because she didn't have normal sensation when I saw her nearly two years after the injury.

Q:     When you say she didn't have normal sensation, what you're saying is she didn't report feeling your test, so she did not report --

A:     That is correct.

Q:     Okay. She did not report normal sensation to you?

A:     That is correct.

It seems clear that although Dr. Kramer said that his opinions may have changed had he been provided with Dr. Frankel's notes and Dr. Kim's notes, he qualified that statement by saying that it depended on what the notes said. When pressed, Dr. Kramer gave an example of how the notes could have made a difference in his opinion—if the notes reflected that the patient reported *normal* sensation at three months. But that was just an example untethered to reality—the notes didn't say Ms. Deane reported normal sensation after three months. Dr. Kramer's testimony on that issue was, at best from petitioners' standpoint, susceptible to more than one interpretation. In ruling on a summary judgment motion, the court improperly adopted the interpretation least favorable to Ms. Deane. *See RDC Melanie Drive, LLC v. Eppard*, 474 Md. 547, 564 (2021) (citation omitted) ("Upon review, this Court must consider the facts in a light most favorable to the non-moving parties, and 'if those facts are susceptible to inferences supporting the position of the party opposing summary judgment, then a grant summary judgment is improper.'").

The circuit court also erred in finding that the only reliable way for diagnosing the nature and extent of Ms. Deane's injury was through exploratory surgery, which she did

21

not have.  Dr. Kramer testified that when the lingual nerve is injured, a patient with the same symptoms as Ms. Deane may very well experience improvement over the ensuing months.  He further testified that his diagnosis of a severed lingual nerve was made possible in Ms. Deane's case only because he examined her more than two years after the surgery:

Q: So how do you determine what injury she has?

A: Based on her exam at that moment and the time frame.  And I may have referred a moment ago to the dependability with which lingual nerves heal, for various reasons; but after two-plus years, the likelihood goes down so that had there been an axonotmesis or a neurotmesis, I may have anticipated greater improvement at two years, when I saw her.

Q: Um-hum. Right.
    So I guess what you're saying is that while reduced sensation can be a symptom of neuropraxia, if it doesn't improve, it supports a diagnosis of neurotmesis?

A: For the sake of discussion in terms of defining the terms, axonotmesis and neurotmesis and neuropraxia indicate different levels of injury to the nerve.

Q: Um-hum.

A: When a nerve's transected, the two ends are separated.  The likelihood of them finding each other is limited.  The other two injuries, the nerve itself is still relatively in contact, and so the likelihood of some amount of improvement is way greater.

Q: Um-hum.

A: Based on the time frame was why I said that I thought there was a neurotmesis.

Petitioners did not counter Dr. Kramer's testimony with any testimony, expert or otherwise.  Thus, when the court found that exploratory surgery was the only reliable way to determine the nature and extent of Ms. Deane's injury, it relied solely on excerpts from the medical literature provided by the parties.

There are two problems with the court's approach. *First*, expert testimony is required to establish the standard of care, breach, and causation elements of a medical negligence claim. Learned treatises, however, are admissible only "when there is an expert witness on the stand." JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 813, at 420 (4th ed. 2010); *see also* Md. Rule 5-803(b)(18). Yet here, the court was interpreting the medical literature without the assistance of expert testimony.

*Second*, and related to the first, the medical literature does not appear to be inconsistent with Dr. Kramer's testimony that the passage of two years since the surgery was the factor that enabled him to diagnose the severed lingual nerve utilizing the sensory examination. As Dr. Kramer testified, and as the medical literature relied upon by the court seems to reflect, a patient with the same symptoms reported by Ms. Deane may experience improvement in the months following the procedure.

So, although the sensory tests may reliably assess the patient's symptoms, if the patient is still within the window of time in which improvement is possible, it's too early to tell the precise nature and extent of the injury without exploratory surgery. But that's not the case after two years, according to Dr. Kramer. The medical literature cited by the court does not appear to contradict Dr. Kramer on this point. Although the jury might, depending on the evidence, have a basis to conclude that exploratory surgery is necessary to diagnose the injury even after two years, the circuit court did not have the discretion to so find on summary judgment.

Finally, as Dr. Kramer explained, his examination of Ms. Deane assessed her condition at a specific snapshot in time—the day he examined her. But so did Dr. Kim's

23

examination at three months post-surgery, and he used some, but not all, of the same sensory tests performed by Dr. Kramer. While we recognize that the results of the testing from these different points in time were inconsistent and contradictory, we have not been directed to any caselaw or evidence in this record that mandates the conclusion reached by the circuit court that the latter test performed by Dr. Kramer was suspect and the earlier one by Dr. Kim was reliable. Again, any tension between the two tests should have been left for the jury to sort out.

### *The Admissibility of Dr. Kotikian's Opinion*

The circuit court excluded Dr. Kotikian's opinions on three grounds: (1) because they were based on Dr. Kramer's opinion, which the court had deemed unreliable and inadmissible; (2) because Dr. Kotikian discounted Dr. Kim's findings, as reflected in his notes, that three months after surgery, Ms. Deane was reporting improvement of her symptoms; and (3) under *Meda v. Brown,* 318 Md. 418 (1990). We conclude that the circuit court erred in its analysis of each ground, and we, therefore, hold that the court erred in its ruling on Dr. Kotikian's testimony.

Dr. Kotikian testified at his deposition that, based on his review of Ms. Deane's description of her symptoms and the clinical findings of Dr. Kramer, he intended to opine at trial, to a reasonable degree of medical certainty, that Ms. Deane suffered a permanent lingual nerve injury. In addition, he was prepared to opine at trial that

> [t]he injury to each lingual nerve likely occurred while the third molar in question was being sectioned and the bur traversed the lingual plate causing the lingual nerve to be severed, or appropriate and known steps were not taken to avoid transecting the nerve while cutting the gum tissues to expose and elevate the tooth. These injuries could have been prevented if a retractor

24

or a periosteal elevator (#9) had been placed between the lingual plate and the periosteum during the time of sectioning and/or adequate buccal and distal troughs were done around the teeth. Either of these actions would be considered deviations from the applicable standard of care and caused injury and harm to the patient.

Having determined that the circuit court erred in its analysis of Dr. Kramer's proffered testimony, we also conclude that the Court erred in excluding Dr. Kotikian's testimony on the ground that it relied on Dr. Kramer's testimony.

Similarly, Dr. Kotikian's failure to rely on Dr. Kim's notes about Ms. Deane's improving condition should not have disqualified his testimony. The court acknowledged that Ms. Deane disputed that she had reported any improvement to Dr. Kim, but nevertheless granted summary judgment "principally due to her unjustified[10] failure" to follow-up with Dr. Kim. The court did not explain the connection of Ms. Deane's failure to return for the follow-up appointment with the factual dispute over what Ms. Deane reported to Dr. Kim about her symptoms. As an expert, Dr. Kotikian was entitled to assume that Dr. Kramer's examination and diagnosis were reliable. The court simply found Dr. Kim to be more credible than Dr. Kramer, even though as an expert, Dr. Kotikian was entitled to assume the reliability of Dr Kramer's examination and diagnosis. Making that credibility determination put the Court in the position of factfinder. Thus, it was clear error to exclude Dr. Kotikian's testimony on that ground.

---

[10] This is another example of impermissible fact-finding. The jury, not the court, should decide whether Ms. Deane's failure to keep a follow-up appointment was "unjustified."

25

Finally, the circuit court erred in finding that Dr. Kotikian's testimony was inadmissible under *Meda v. Brown,* 318 Md. 418 (1990). The court interpreted *Meda* as standing for the proposition that "[i]f the subject injury is a well-known complication or risk of medical or dental procedure and could occur in the absence of any medical or dental negligence on behalf of the surgeon, then an expert opinion upon an 'inference of negligence theory' is not viable or admissible[.]" Citing Ms. Deane's signature on the informed consent form from the day of the oral surgery as well as certain medical authorities, the circuit found "that the conditions that Plaintiff complains of are well known complications of the procedure Plaintiff underwent and do occur in the absence of negligence by the surgeon." Because the court concluded that the injuries allegedly suffered by Ms. Deane were known risks that could be realized without negligence on the surgeon's part, it determined that Dr. Kotikian's "inference of negligence" was inadmissible under *Meda*.

Although the literature cited by the court says that if the lingual nerve is situated in certain positions, "it is at risk of damage when the associated tooth is removed **regardless of the care employed during surgery**[,]" there does not appear to be any indication that the specific injury alleged here—the bilateral severance of the lingual nerve—is one such injury that can occur without regard to the care employed by the surgeon.

Dr. Kotikian addressed that very point at his deposition when questioned by Ms. Deane's counsel:

> Q:      The literature that [petitioners' counsel] cited indicates that you can
> have an injury to the lingual nerve when everything is done within the

standard of care. Does that hold true for a severance of the lingual nerve as well?

A:    No. No. So injury is broad, so it can be --repeat your question again.

Q:    [Petitioners' counsel] said and you agreed that you can do -- that a surgeon can do everything within the standard of care and still have injury to the lingual nerve.
My question is: Does that hold true when you have a severance of the lingual nerve as well? Can you do everything -- can a surgeon do everything within the standard of care and still severe the nerve?

A:    Not if the appropriate measures are taken.

Q:    And is severing of the nerve -- In the literature that you've reviewed, is severing of the lingual nerve distinguished from the data on injury to the lingual nerve?

A:    So injury can be the bruising, partial tear, so general; whereas, full tear would be no sensation.

Q:    Right. And can you have a severance of the nerve and still be doing things within the standard -- everything within the standard of care?
Or does it have to be a breach in the standard of care to have a severance of the nerve?

A:    Breach in the standard.

Q:    And in Ms. Deane's case do you believe that she suffered a severance of the lingual nerve bilaterally?

A:    Yes.

The circuit court pointed to no evidence in the record that refuted this testimony, and the only expert testimony in the summary judgment record on this issue came from Dr. Kotikian. For the court to have nonetheless "found" that Ms. Deane's alleged injuries could have occurred without negligence, it had to discount Dr. Kotikian's testimony on that issue and impose its own interpretation of the medical literature, without the aid of any

27

expert testimony to explain the text. Here again, Dr. Kotikian's credibility was a matter for the jury to decide.

In addition, the circuit court misapplied *Meda*. In *Meda*, the plaintiff sustained compression injuries to the ulnar nerve in her arm during a bilateral breast biopsy surgery. 318 Md. at 420-21. Her arm was restrained during the procedure. *Id.* at 426. The jury found in favor of the plaintiff, but the judge granted judgment notwithstanding the verdict, finding that "[t]he testimony of plaintiff's two experts . . . rested upon inferences and thus constituted the kind of *res ipsa loquitur* evidence [that is] barred . . . ." *Id.* at 420. The Court of Special Appeals reversed, holding "that the concept of *res ipsa loquitur* was applicable because laymen could properly infer negligence from the happening of an unusual injury to a healthy part of the patient's body[.]" *Id.*

We affirmed, not based on *res ipsa loquitur*, which we found inapplicable, but rather "because the testimony was sufficient to support the inferential conclusion of negligence drawn by the plaintiff's experts." *Id.* Of particular note here, one of the plaintiff's experts in *Meda* testified that the injury suffered by the plaintiff—compression injury to the ulnar nerve—was a well-known risk in the medical profession, but that "the standard of care requires that the arm be positioned and secured in such a manner that nerve compression will not occur." *Id.* at 426. The plaintiff's experts could not determine precisely how the plaintiff's nerve was compressed—as there were several possible ways it could have happened—but both experts opined that the injury was caused by the defendants' deviation from the standard of care in failing to protect the ulnar nerve during the procedure. *Id.* at 427.

28

In affirming, we took note of the long-held principle that negligence "can be established by the proof of circumstances from which its existence may be inferred." *Id.* at 427-28 (citation omitted). We held:

> In the case before us, however, the jurors were not asked to draw an inference unaided by any expert testimony. The plaintiff's experts, armed with their fund of knowledge, drew certain inferences from the circumstances. Having examined the testimony of the experts, we conclude that the trial judge did not err in permitting that testimony and allowing the doctors to base their opinions on a combination of direct and circumstantial evidence. The doctors recited in detail the physical facts they considered, and the medical facts they added to the equation to reach the conclusion they did. The facts had support in the record, and the reasoning employed was based upon logic rather than peculation or conjecture.

*Id.* at 428.

Ms. Deane's theory of negligence substantially tracks the analysis permitted under *Meda*. In *Meda*, the plaintiff's experts applied their medical expertise to infer from the circumstantial evidence that medical negligence caused the plaintiff's injury; here, Ms. Deane's expert, Dr. Kotikian, likewise applied his knowledge and experience to infer negligence based on Ms. Deane's testimony about her symptoms and Dr. Kramer's assessment that the lingual nerve was severed.

Accordingly, we conclude that the circuit court mistakenly applied *Meda* in excluding Ms. Deane's experts.

## C

We are remanding this case for further proceedings. In between the circuit court's dismissal of Ms. Deane's case with prejudice and the Court of Special Appeals' reversal of the same, this Court issued its decision in *Rochkind v. Stevenson*. There, this court

29

abandoned the *Frye-Reed* approach in favor of the approach articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court held that Rule 702 of the Federal Rules of Evidence "superseded *Frye*'s general acceptance test." *Rochkind*, 471 Md. at 5. In its place, the Supreme Court "provided a list of flexible factors to help courts determine the reliability of expert testimony." *Id.*

In *Rochkind*, we adopted *Daubert* with the hope that it would "streamline the evaluation of scientific expert testimony under Rule 5-702." *Id.* at 35. Thus, going forward, "trial court[s] may apply some, all, or none of the [*Daubert*] factors depending on the particular expert testimony at issue." *Id.* at 37. Those factors include:

> (1) whether a theory or technique can be (and has been) tested;
> (2) whether a theory or technique has been subjected to peer review and publication;
> (3) whether a particular scientific technique has a known or potential rate of error;
> (4) the existence and maintenance of standards and controls; []
> (5) whether a theory or technique is generally accepted[;]
>
> ****
>
> (6) whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;
> (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
> (8) whether the expert has adequately accounted for obvious alternative explanations;
> (9) whether the expert is being as careful as he [or she] would be in his [or her] regular professional work outside his [or her] paid litigation consulting; and
> (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

30

*Id.* at 35-36.

On remand, the trial court will have the discretion to determine whether and to what extent petitioners will be permitted to challenge the admissibility of Ms. Deane's experts' testimony under the standard adopted in *Rochkind*. Such discretion will include, but not be limited to, determining whether the briefing will be re-opened to allow for different arguments to be made and defining which *Daubert* factors and issues will be heard. In light of the nature and extent of the factual and credibility findings made by the trial judge that granted summary judgment and to avoid any *appearance* of partiality going forward, this case should be assigned to a different judge for all further proceedings.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR CALVERT COUNTY AND REMAND WITH INSTRUCTIONS TO CONDUCT FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PETITIONERS**.

Circuit Court for Calvert County
Case No. C-04-CV-18-000396
Argued: March 7, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 43

September Term, 2021

———————————————————

BENNETT FRANKEL, ET AL.

v.

CASEY LOU DEANE

———————————————————

\*Getty, C.J.
Watts
Hotten
Booth
Biran
Gould
McDonald, Robert N. (Senior
Judge, Specially Assigned),

JJ.

———————————————————

Dissenting Opinion by Watts, J.

———————————————————

Filed: August 25, 2022

\*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

Respectfully, I dissent.  Like the Majority, I would hold that the Circuit Court for Calvert County abused its discretion in refusing to admit Casey Lou Deane's expert witnesses' testimony and erred as a matter of law in granting summary judgment. However, because the issues in this case do not implicate the factors set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993) and other factors adopted by this Court in Rochkind v. Stevenson, 471 Md. 1, 4-5, 236 A.3d 630, 633 (2020), reconsideration denied (Sept. 25, 2020), I would not remand the case for application of Rochkind.  The main issues in this case are: whether the circuit court erred in ruling that, under this Court's holding in Meda v. Brown, 318 Md. 418, 428, 569 A.2d 202, 206-07 (1990), for expert testimony that a breach of the standard of care may be inferred to be admissible in a medical malpractice case, the evidence must demonstrate that the alleged injury is not something that would have happened in the absence of negligence; whether contributory negligence can be determined at the summary judgment stage based on facts found by the trial court; and whether in a medical malpractice case an expert is required to review a treating physician's notes for the expert's testimony to be admissible. I would affirm the judgment of the Court of Special Appeals reversing the circuit court's grant of summary judgment.  And because the issues concerning the admissibility of Ms. Deane's experts' testimony were resolved by the reversal and do not involve an issue preserved under Frye-Reed or Maryland Rule 5-702, the case should be remanded for trial, rather than for a hearing under Rochkind.

In 2018, Ms. Deane filed a malpractice claim against Dr. Bennett Frankel and his practice, Southern Maryland Oral and Maxillofacial Surgery, P.A., alleging that Dr.

Frankel breached the standard of care in extracting her wisdom teeth and in treating a nerve injury after the surgery.[1] Ms. Deane alleged that she suffered permanent loss of feeling in her tongue as a result of Dr. Frankel having cut the lingual nerves in her jaw in the process of extracting her wisdom teeth.[2] In support of the claim, Ms. Deane designated two experts: Dr. Richard Kramer and Dr. Armond Kotikian. According to Ms. Deane's expert witness designations and the experts' depositions, the first expert, Dr. Kramer, a dentist, would have testified that based on neurosensory testing, Ms. Deane suffered from a bilateral transection (severing) of the lingual nerves and that the injury was permanent. The second expert, Dr. Kotikian, also a dentist, was to testify that Dr. Frankel breached the standard of

_____

[1]On September 13, 2019, Ms. Deane filed an amended complaint naming Dr. Clay Kim, a member of Dr. Frankel's practice, as a defendant in the matter and alleging that, after the tooth extraction, Dr. Kim was negligent in failing to conduct proper testing and in failing to refer her to an appropriate specialist.

[2]On January 14, 2016, Dr. Frankel surgically removed Ms. Deane's wisdom teeth at Southern Maryland Oral & Maxillofacial Surgery, P.A. ("the practice"). Following the surgery, Ms. Deane complained to the practice of a lack of sensation in, or numbness affecting, her tongue and her mouth. A representative of the practice encouraged Ms. Deane to rest and wait for the effects of the anesthesia to fade. A few days after the surgery, Ms. Deane returned to see Dr. Frankel for a follow-up appointment and reported the numbness in her tongue. Ms. Deane did not attend an additional scheduled appointment for the following week and notified Dr. Frankel that she would not be returning. Ms. Deane felt that Dr. Frankel was not taking her condition seriously. A few months later, in April 2016, Ms. Deane returned to the practice and saw a different dentist, Dr. Clay Kim, because Dr. Frankel had retired. At the appointment, Dr. Kim performed neurosensory testing, a "clinically useful method to diagnose" injuries to the lingual nerve, whereby the patient reports whether or not he or she can feel, taste, and sense in response to stimuli such as sharp objects, hot or cold substances, and bitter substances. Dr. Kim's notes contain the following diagnostic assessment: "right lingual nerve paresthesia, improving[,]" a mild injury, and reported that Ms. Deane described some improvement in her condition. Ms. Deane disputes ever reporting improvement in her condition to Dr. Frankel or Dr. Kim.

Two years later, Ms. Deane continued to experience a lack of sensation in her tongue. Ms. Deane saw Dr. Richard E. Kramer and was eventually diagnosed with a bilateral transection of the lingual nerve, a permanent condition.

care in performing Ms. Deane's surgery and that she had "anesthesia" of the tongue likely caused by severance of the bilingual nerves by Dr. Frankel. Dr. Kotikian was also to testify that Dr. Clay Kim, a member of Dr. Frankel's practice, was negligent in failing to refer Ms. Deane to an appropriate specialist to repair the nerve damage.

The defendants moved for summary judgment, contending that the proposed expert testimony was inadmissible because Dr. Kramer's review of the medical record was allegedly not complete. Specifically, the defendants alleged that Dr. Kramer did not review the notes of Dr. Frankel or Dr. Kim—reporting that Ms. Deane had improvement inconsistent with a bilateral severance—and thus, according to the defendants, Dr. Kramer's testimony was inadmissible. According to the defendants, because Dr. Kotikian relied on Dr. Kramer's allegedly faulty conclusions, which were not based on facts in Dr. Frankel's and Dr. Kim's notes, Dr. Kotikian's opinion was also inadmissible. In addition, according to the defendants, under Meda, in the absence of physical evidence of injury, Dr. Kotikian was not permitted to render an opinion that negligence could be inferred based on the circumstances of the case. The defendants argued that this was the case because nerve damage is a known risk of wisdom tooth extractions, as opposed to the type of injury that does not ordinarily occur in the absence of negligence.

The circuit court granted summary judgment, finding that Dr. Kramer's opinion was inadmissible because Dr. Kramer had not reviewed the notes of Dr. Frankel and Dr. Kim. The circuit court explained that Dr. Kramer's opinion was grounded mainly on Ms. Deane's subjective self-reporting and his own diagnostic tests. The circuit court found that Dr. Kotikian's testimony was inadmissible because it was based largely on conclusions

drawn by Dr. Kramer, who had not reviewed the treating physicians' notes. In granting summary judgment, the circuit court stated that Dr. Kotikian's testimony was inadmissible under Meda, Frye-Reed, and Maryland Rule 5-702, and that Ms. Deane was contributorily negligent in failing to attend follow-up appointments. In explaining its ruling on contributory negligence, the circuit court stated that it found "as key facts that the Plaintiff's failure to attend follow-up appointments as recommended and instructed prevented a timely referral to a nerve repair specialist for microneuroexploratory surgery[.]"

The Court of Special Appeals, in an unreported opinion, reversed the decision of the circuit court. See Casey Lou Deane v. S. Md. Oral and Maxillofacial Surgery, P.A. et al., No. 0218, Sept. Term, 2020, 2021 WL 3523939, at *7-9 (Md. Ct. Spec. App. Aug. 11, 2021). The Court of Special Appeals held that a failure to review records of treating physicians goes to the weight of expert testimony rather than to its admissibility, that the circuit court misinterpreted this Court's holding in Meda,[3] and that the finding of contributory negligence was inappropriate at the summary judgment stage. See Deane,

[3]In Meda, 318 Md. at 422, 426-29, 569 A.2d at 204, 206-08, this Court held that, in a medical malpractice case, an expert may render an opinion based on inferences drawn from the facts and circumstances of the case. This Court concluded that, although the two experts at issue offered an inference "based upon [their] knowledge of the facts and upon [their] expertise" and although they could not "testify as to the precise act of negligence that caused injury[,]" the evidence was legally sufficient to support the verdict because the experts reached permissible conclusions. Id. at 427-28, 569 A.2d at 206. This Court determined that an expert may rely upon circumstantial evidence in rendering an opinion, reaffirmed the principle that in complex cases a plaintiff must offer expert testimony to assist the jury in determining negligence and causation, and held that the trial court did not err in allowing the experts "to base their opinions on a combination of direct and circumstantial evidence." Id. at 427-28, 569 A.2d at 206-07.

2021 WL 3523939, at *7-9.

Against this backdrop, the Majority vacates the decision of the Court of Special Appeals and directs the Court of Special Appeals to reverse and remand the case for the circuit court to apply Rochkind, *i.e.*, the Daubert factors and additional ones adopted in Rochkind.  See Maj. Op. at 31.  In doing so, the Majority states:

> On remand, the trial court will have the discretion to determine whether and to what extent petitioners will be permitted to challenge the admissibility of Ms. Deane's experts' testimony under the standard adopted in *Rochkind*.  Such discretion will include, but not be limited to, determining whether the briefing will be re-opened to allow for different arguments to be made and defining which *Daubert* factors and issues will be heard.

Maj. Op. at 31.  I would not remand the case to the circuit court to apply the Daubert factors and additional ones adopted in Rochkind and give the court the discretion to determine whether briefing will be reopened to allow different arguments to be made.  Instead, I would affirm the Court of Special Appeals's decision and remand the case for trial.  In Rochkind, 471 Md. at 38, 236 A.3d at 652, this Court stated that:

> Since *Daubert* is a new interpretation of Rule 5-702, our decision today "applies to this case and any other cases that are pending on direct appeal when this opinion is filed, where the relevant question has been preserved for appellate review." *Kazadi*[ *v. State*], 467 Md. [1,] 47, 223 A.3d 554[, 581 (2020]; *Hackney v. State*, 459 Md. 108, 119, 184 A.3d 414[, 421] (2018); *State v. Daughtry*, 419 Md. 35, 77 n.26, 18 A.3d 60[, 85 n.26] (2011).  In this context, the "relevant question" is whether a trial court erred in admitting or excluding expert testimony under Maryland Rule 5-702 or *Frye-Reed*.

This statement did not mean that the holding in Rochkind would apply to the admission of expert testimony in cases in which the relevant question preserved for review had nothing to do with the admission of expert testimony under Frye-Reed and only nominally pertained to Maryland Rule 5-702.  The intent of the language could not have been to

- 5 -

essentially give a do-over to any case pending on appeal involving an objection to the admission of expert testimony for any reason.

Rather, in Rochkind, this Court stated that its new interpretation of Maryland Rule 5-702 (adopting the Daubert standard) would apply to Rochkind and any other cases pending on appeal where the relevant question had been preserved for appellate review. The Court defined the relevant question as whether the trial court erred in admitting or excluding expert testimony under Maryland Rule 5-702 or Frye-Reed. In this case, the circuit court made no substantive ruling with respect to Frye-Reed or Maryland Rule 5-702. In order for the language concerning the relevant question having been preserved for appellate review to have any meaning with respect to the application of Rochkind, there would need to have been an argument made and a ruling by the trial court pertaining to the admissibility of evidence under Frye-Reed or some aspect of Maryland Rule 5-702.

Neither occurred in this case. In its opinion, the Court of Special Appeals observed:

> Before the trial court, Dr. Frankel and Southern Maryland allegedly challenged the admissibility of the opinions of Drs. Kramer and Kotikian, in part, based on *Frye-Reed*, which provides that when expert testimony was based on a novel scientific principle or discovery its admissibility was predicated on its general acceptance "in the particular field in which it belongs."

Deane, 2021 WL 3523939, at \*6 n.4. The Court of Special Appeals, however, summarized the defendants' contentions as alleging that "there is no physical or objective evidence of the claimed bilateral severing injury" and that, because Dr. Kramer failed to review the treating physicians' notes, he did not consider evidence that may have led him to reach a different conclusion about Ms. Deane's injury. Id. at \*6 (cleaned up). In the end, the Court

of Special Appeals stated: "The bases for the trial court's rulings on admissibility, although referring to *Frye-Reed*, did not implicate the 'general acceptance' standard nor did they invoke the analytical factors put forth in *Daubert*." Id. at *6 n.4.  I agree.

Put simply, there is no need to remand the case for consideration of the ten factors adopted by this Court in Rochkind.  In Rochkind, 471 Md. at 4-5, 236 A.3d at 632-33, this Court abandoned the standard for admissibility of expert testimony set forth in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923) and adopted by this Court in Reed v. State, 283 Md. 374, 382, 391 A.2d 364, 368 (1978).  Replacing the Frye-Reed approach, this Court adopted factors[4] set forth in Daubert, 509 U.S. at 593-94, as well as additional factors[5] contained in the Advisory Committee Note to Federal Rule of Evidence 702.

---

[4]In Rochkind, 471 Md. at 35, 236 A.3d at 650, this Court adopted the following Daubert factors:

(1) whether a theory or technique can be (and has been) tested;

(2) whether a theory or technique has been subjected to peer review and publication;

(3) whether a particular scientific technique has a known or potential rate of error;

(4) the existence and maintenance of standards and controls; and

(5) whether a theory or technique is generally accepted.

(Quoting Daubert, 509 U.S. at 593-94; Fed. R. Evid. 702 Advisory Committee Note).
[5]In Rochkind, 471 Md. at 35-36, 236 A.3d at 650, this Court adopted the following additional factors:

(6) whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the

Rochkind, 471 Md. at 35-36, 236 A.3d at 650. In so doing, as discussed above, this Court stated that its decision would apply to any case pending on appeal where the relevant question had been preserved for appellate review.[6]

litigation, or whether they have developed their opinions expressly for purposes of testifying;

(7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(8) whether the expert has adequately accounted for obvious alternative explanations;

(9) whether the expert is being as careful as he [or she] would be in his [or her] regular professional work outside his [or her] paid litigation consulting; and

(10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

(Quoting Fed. R. Evid. 702 Advisory Committee Note) (alterations in original).
[6]As previously explained, though:

In Griffith v. Kentucky, 479 U.S. 314, 322[] (1987), the Supreme Court held that not applying a newly announced constitutional rule to criminal cases pending on direct appeal is not consistent with basic principles of constitutional adjudication. In light of the Supreme Court's holding in Griffith, in some instances, this Court has given the application of new holdings to cases that were pending on appeal, where the new holding involved an issue of constitutional significance in criminal law. See, e.g., Hackney v. State, 459 Md. 108, 119, 184 A.3d 414, 421 (2018); State v. Daughtry, 419 Md. 35, 77 n.26, 18 A.3d 60, 85 n.26 (2011). Neither the holding in Griffith concerning the application of a newly announced constitutional rule nor the application of Griffith in Kazadi v. State, 467 Md. 1, 47, 223 A.3d 554, 581 (2020), and Daughtry would apply to a change of the evidentiary standard for use under Maryland Rule 5-702. Here, the Majority's holding should apply to this case and future trials; the Majority's opinion should not be construed as giving rise to any grounds for relief in cases in which the trial occurred before the issuance of this opinion.

- 8 -

In this case, despite the circuit court's ruling having mentioned <u>Frye</u>-<u>Reed</u>, there was no meaningful challenge to the admissibility of the proposed experts' testimony under <u>Frye-Reed</u> and no real finding by the circuit court concerning <u>Frye</u>-<u>Reed</u>. In describing Dr. Frankel's contention as to the admissibility of Dr. Kramer's and Dr. Kotikian's testimony, the Majority states:

> Putting it less charitably, Dr. Frankel averred that "the entire factual basis of [Ms. Deane's] case depends on [her] experts' rewriting the medical history pursuant to the self-serving statements of [Ms. Deane] made for purposes of litigation." Thus, he contended that the expert testimony of Drs. Kramer and Kotikian were inadmissible under *Meda*, the *Frye-Reed* standard, and Rule 5-702, and that without expert testimony, Ms. Deane could not present a prima facie case of negligence.

Maj. Op. at 9 (alterations in original). The circuit court's decision to exclude Ms. Deane's experts' testimony was based on the misconception that an expert is required to review a treating physician's notes for the expert's testimony to be admissible, a misapplication of this Court's holding in <u>Meda</u>, and a determination of contributory negligence based on fact finding by the court.

Conceivably, requiring an expert witness to have reviewed a treating physician's notes could be cast as a finding that there was an insufficient factual basis for the expert's testimony under Maryland Rule 5-702, but the circuit court's sole ground for finding Dr. Kramer's testimony inadmissible was his alleged failure to have reviewed Dr. Frankel's and Dr. Kim's notes. Clearly, in a medical malpractice case, the finding of an alleged

<u>Rochkind</u>, 471 Md. at 67 n.6, 236 A.3d at 669 n.6 (Watts, J., dissenting).

analytical gap[7] in an expert's data and conclusions, under Maryland Rule 5-702 prior to Rochkind or after the adoption of the Daubert factors and additional factors in Rochkind, would not hinge solely on whether an expert reviewed a treating physician's notes.[8]

---

[7]In 2009, in Blackwell v. Wyeth, 408 Md. 575, 591, 605, 971 A.2d 235, 245, 253 (2009), in discussing Frye-Reed jurisprudence, this Court noted that various federal courts had "had occasion to scrutinize the reliability of the analytical framework utilized by an expert in formulating a novel theory of science[.]" (Cleaned up). We noted that the concept of the "analytical gap" had developed and that the concept had been used by federal courts applying Daubert and by some State courts applying Frye. See Blackwell, 408 Md. at 604-07, 971 A.2d at 253-54. We stated that "[g]enerally accepted methodology[ ] must be coupled with generally accepted analysis in order to avoid the pitfalls of an 'analytical gap[,]'" id. at 608, 971 A.2d at 255, and incorporated the concept of the "analytical gap" into Maryland's Frye-Reed analysis.

Later, in Rochkind v. Stevenson, 454 Md. 277, 295-96, 164 A.3d 254, 265 (2017), when the case first came to the Court, we applied the "analytical gap" concept under Maryland Rule 5-702(3) and held that the expert testimony at issue lacked a sufficient factual basis, as required by the Rule, and that the trial court abused its discretion in allowing the expert to render an opinion that lead exposure can cause ADHD generally and that lead caused the plaintiff's ADHD specifically. We explained that the trial court had "failed to determine whether [the] proffered sources logically supported [the expert's] opinion that lead exposure can cause ADHD." Id. at 295, 164 A.3d at 264. In applying the "analytical gap" concept, this Court concluded that the trial court erred by "fail[ing] to check for an 'analytical gap' between the expert's data and her conclusion." Id. at 295, 164 A.3d at 264.

[8]By way of analogy, this Court has held that in order to render an expert opinion in medical contexts, an expert witness need not conduct a physical examination of the subject. In Levitas v. Christian, 454 Md. 233, 254, 164 A.3d 228, 240 (2017), we explained that "[a]n expert's factual basis 'may arise from a number of sources, such as facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions[]'" and affirmed the Court of Special Appeals's reversal of the trial court's decision to exclude an expert's testimony as to lead-source causation and medical causation. (Citations omitted). We held that the expert in Levitas should have been permitted to testify as to lead-source causation because the expert relied upon lead readings found on the interior of the dwelling, because the plaintiff experienced elevated blood-lead levels when he lived there, and because the expert acknowledged other sources existed. See id. at 249, 164 A.3d at 237. As for medical causation, although the expert did not perform cognitive tests himself, he was qualified as an expert by virtue of his familiarity with the testing and literature and

- 10 -

To remand the case for an application of the Daubert factors and additional ones adopted by this Court in Rochkind and give the circuit court unguided discretion to allow additional briefing of new arguments is in essence to provide the defendants a second bite at the apple in challenging the admissibility of Ms. Deane's expert witnesses' testimony—this time under Rochkind as opposed to the grounds previously relied upon and rejected by the Court of Special Appeals and this Court.

For the above reasons, respectfully, I dissent.

---

possessed a sufficient factual basis to offer an opinion based on the reports of others as well as medical studies.  See id. at 253-54, 164 A.3d at 240.  In so holding, we specifically rejected a rule that in order to render such an opinion, an expert must meet personally with the plaintiff.  See id. at 253-54, 164 A.3d at 240.

Given our holding that a physical examination is not a predicate for offering expert opinion, it stands to reason that not reviewing the notes of a treating physician would also not bar the admission of expert testimony and would instead go to the weight to be accorded the expert's opinion.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/43a21cn.pdf