*Doctor's Weight Loss Centers, Inc., et al. v. Shelly Blackston*, No. 17, September Term, 2023.  Opinion by Eaves, J.

**CHOICE OF LAW — *LEX LOCI DELICTI* — MEDICAL NEGLIGENCE**

The Supreme Court of Maryland held that the Appellate Court of Maryland properly applied Virginia substantive law in accordance with the doctrine of *lex loci delicti*. Pursuant to that doctrine, which requires the application of the substantive law of the state where the last element required to complete a tort occurs, the Supreme Court held that there was sufficient evidence that Respondent, Shelly Blackston, suffered a cognizable injury during a surgery that a jury determined had been negligently performed by Dr. Alva Roy Heron, Jr.  Accordingly, Virginia law applied with respect to the damages recoverable.

Circuit Court for Prince George's County
Case No. CAL 18-32511
Argued: January 8, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 17

September Term, 2023

DOCTOR'S WEIGHT LOSS CENTERS, INC.,
ET AL.

v.

SHELLY BLACKSTON

Fader, C.J.
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Opinion by Eaves, J.

Filed: July 31, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

# I
# INTRODUCTION

Pursuant to our choice of law rule, *lex loci delicti*, we apply the substantive law of the place of the wrong. For a tort, that is the place where the final element of the cause of action occurs. In the negligence context, that is generally where the first harm or injury occurs. This case comes before us to determine where the torts suffered by Respondent, Shelly Blackston, first arose—in the Commonwealth of Virginia or the State of Maryland. The answer will determine which jurisdiction's cap on damages is applicable to the damages awarded to Ms. Blackston by a jury.

This case arises from a liposuction procedure (hereinafter the "procedure") that one of the Petitioners, Dr. Alva Roy Heron, Jr., performed on Ms. Blackston at his office in Alexandria, Virginia. During the procedure, she experienced excruciating pain, which Dr. Heron treated with additional injections of the local anesthesia he had administered prior to beginning the procedure. After the procedure, Ms. Blackston returned to her home in Maryland, where the pain continued. Within a few days, an infection manifested, and she required hospitalization and underwent several procedures to treat that infection. As a result of the procedure, Ms. Blackston suffers from permanent physical and emotional injuries.

In September 2018, Ms. Blackston filed a complaint alleging medical malpractice and failure to obtain informed consent in the Circuit Court for Prince George's County against Petitioners—Dr. Heron, Doctor's Weight Loss Centers, Inc., the A. Roy Heron Global Foundation for Community Wellness, and the Heron Smart Lipo Center. After a

five-day trial, a jury found in her favor on both claims. The jury awarded Ms. Blackston damages of $2,300,900, which included non-economic damages of $2,000,000, economic damages of $60,000, and medical expenses of $240,900. The jury was not asked to determine where Ms. Blackston was first injured.

Thereafter, Petitioners filed several post-trial motions, including a motion for statutory remittitur,[1] which the court granted in part and denied in part. The circuit court reduced the non-economic damages to $755,000, consistent with Maryland's statutory cap on non-economic damages. The Appellate Court of Maryland reversed, however, holding that Virginia's damages cap applies because Ms. Blackston was infected and, therefore, first injured (completing her claim) in Virginia.

Petitioners filed a petition for writ of certiorari because whether Ms. Blackston was injured in Maryland (where her symptoms manifested) or Virginia (where the procedure took place) is critical in determining the amount of her monetary damages. We have rephrased the question presented as follows:[2] Did the circuit court err in applying Maryland law on the limitation of non-economic damages?

For the reasons set forth below, we hold that the circuit court erred, and we affirm

---

[1] Maryland and Virginia each impose limits on recovery applicable to medical malpractice claims that would reduce the amount of the jury's verdict. At the time of this lawsuit, Maryland limited the amount of *non-economic damages* a party can recover to $755,000, Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-2A-09(b) (1957, 2020 Repl. Vol.), for a total award in this case of $1,055,900. Virginia limited the *total amount of recovery* a victim may receive, Va. Code Ann. § 8.01-581.15; in this case, to $2,150,000.

[2] This Court has the authority to rephrase any question presented to it in a petition for a writ of certiorari. *United Parcel Serv. v. Strothers*, 482 Md. 198, 205 (2022).

the judgment of the Appellate Court.

## II
## BACKGROUND

### A.    *Factual Background*

Dr. Heron is a cosmetic surgeon with an office in Alexandria, Virginia.  He holds a Virginia medical license, and, in 2008, he completed the American Medical Society of Cosmetic Surgery's two-day course in cosmetic surgery.  Completion of the course certified Dr. Heron as a "cosmetic surgeon," qualifying him to perform "Smart Liposuction."[3]  Dr. Heron then spent the next two months performing Smart Liposuction at a plastic surgeon's office before opening his own cosmetic surgery practice.  Ms. Blackston is a resident of Upper Marlboro, Maryland, who underwent a Smart Liposuction procedure at Dr. Heron's office in Virginia after being referred to him by another physician who had treated her for an unrelated condition.

#### 1. Pre-operative appointments

Ms. Blackston first visited Dr. Heron's office on January 12, 2015.  There, she completed routine intake forms and learned about Smart Liposuction from Dr. Heron's office assistant and Dr. Heron's wife, Barbara Heron.  Three days later, Ms. Blackston

---

[3] "Liposuction" is a type of surgery that "uses suction to remove fat from specific areas of the body," contouring those areas.  *Liposuction*, Mayo Clinic https://www.mayoclinic.org/tests-procedures/liposuction/about/pac-20384586#:~:text=Liposuction%20is%20a%20type%20of,include%20lipoplasty%20and%20body%20contouring [https://perma.cc/5G2P-T9MP] (last visited March 11, 2024).  "Smart Liposuction" is a laser-assisted form of liposuction.  Jason C. McBean & Bruce E. Katz, *Laser Lipolysis: An Update*, The Journal of Clinical and Aesthetic Dermatology, July 2011, at 25, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3140909/ [https://perma.cc/6PT7-8C9T].

returned for a pre-operation evaluation. At this appointment, Dr. Heron met with her to discuss the details of Smart Liposuction. He told Ms. Blackston about some of the procedure's risks, including that traditional liposuction, in contrast to Smart Liposuction, has a three percent mortality rate. In touting Smart Liposuction's benefits over other forms of liposuction, including the traditional method, Dr. Heron informed Ms. Blackston that Smart Liposuction was "minimally invasive" and "no big deal[.]" The consent forms further stated that "[a]n infection [wa]s quite unusual[.]" After considering the mortality rate that purportedly accompanied traditional liposuction, as well as the other information she learned during her pre-op evaluation with Dr. Heron, Ms. Blackston opted to pursue the Smart Liposuction option and signed the consent forms to undergo that procedure.

### 2. The procedure

Dr. Heron scheduled Ms. Blackston's Smart Liposuction procedure for January 30. In advance, Dr. Heron prescribed the antibiotic Ciprofloxacin ("Cipro") so that she could start taking it the day before the procedure. After administering local anesthesia, Dr. Heron made 15 to 18 different incisions through which cannulas[4] were inserted to extract body fat. Ms. Blackston testified that as soon as the procedure began, she was in a lot of pain and was screaming. There was no record of pain in the medical records, and Dr. Heron testified that screaming was abnormal for a procedure like this and that, if needed, he would have injected additional anesthesia to quell the pain.

---

[4] A "cannula" is "a small tube for insertion into a body cavity or into a duct or vessel." *Cannula*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/cannula [https://perma.cc/X9RS-V29M] (last visited March 11, 2024).

Approximately two hours after the procedure, while still in Dr. Heron's office, Ms. Blackston complained of "dizziness and excruciating pain." Dr. Heron "injected some Lidocaine to numb her and make her feel better." Ms. Blackston left Dr. Heron's office around midnight and returned home to Maryland; the pain, however, persisted for several days.[5]

### 3. Post-operative treatment

On February 3, in accordance with Dr. Heron's routine treatment protocols, Ms. Blackston returned to Dr. Heron's office for a post-operative evaluation. She claims that she never saw Dr. Heron at this appointment, so she reported to his staff (including Barbara Heron) that she was experiencing significant pain, fever, and nausea. Dr. Heron testified that he examined Ms. Blackston, and he noted some drainage, but that there were no signs of infection. He instructed her to continue taking Cipro.

Over the next several days, Ms. Blackston's condition worsened. She was bleeding, developed a high fever, and was "throwing up constantly." The incisions were swollen and oozing puss. Ms. Blackston testified that she reported her deteriorating condition to Dr. Heron and sent him photographs. The parties dispute how Dr. Heron responded when he was alerted to her worsening symptoms. Ms. Blackston recalls that she asked for an

---

[5] Altogether, from check-in to discharge, Ms. Blackston was in Dr. Heron's office for about 12 hours, although the actual procedure lasted for six and a half hours. Testimony established that the pre-operative period lasted two hours and that Ms. Blackston was in the recovery room for an additional two hours. The remaining eight hours were apportioned between the physical procedure and breaks. Throughout the procedure, the door to Dr. Heron's operating room was left open so that Ms. Blackston's mother, a trained physician, could observe its progress.

appointment but was told to come to Dr. Heron's group weight loss clinic on February 14. Dr. Heron denies this. And, when Ms. Blackston's mother called on February 7 requesting a refill of the Cipro prescription because the incision sites were still open and to prevent an infection, Dr. Heron again noted that he did not believe that Ms. Blackston had an infection. He testified that if Ms. Blackston had an infection, he would not have given her the same antibiotic and would have made an appointment to see her.

Despite her worsening condition, Ms. Blackston attended one of Dr. Heron's group weight loss sessions on February 14.[6] At this point, symptoms of her infection were observable to the naked eye. She had to excuse herself twice to use the bathroom because the incision sites were open and draining. Dr. Heron claims that he advised her to make an appointment to see him on February 17.

Before Ms. Blackston returned to see Dr. Heron for the appointment, however, she collapsed at her home and was taken to MedStar Southern Maryland Hospital Center, where she was diagnosed with methicillin-resistant *staphylococcus aureus* ("MRSA"), a highly dangerous, contagious bacterial infection. A few days later, Ms. Blackston was transferred to MedStar Washington Hospital Center ("WHC") to receive more advanced care. In total, Ms. Blackston underwent five separate surgeries and several rounds of antibiotics to treat her MRSA infection.

---

[6] In addition to performing liposuction procedures, Dr. Heron also provided his patients the option to participate in a post-procedure weight-loss program.

*B.*      *Procedural Background*

## 1. Circuit court proceedings

Ms. Blackston sued Petitioners. In the complaint, she alleged that Dr. Heron negligently performed the procedure, and that he breached the standard of care during and immediately after the procedure and in his post-operative care. The complaint also alleged that Dr. Heron failed to advise Ms. Blackston that, because of her weight, she had an increased risk for complications. In other words, the complaint alleged that Dr. Heron failed to obtain her informed consent for the procedure.

On January 24, 2020, Ms. Blackston filed a pretrial statement asserting, among other things, that certain provisions of Virginia law applied to the case. Specifically, she claimed that Virginia Code § 8.01-581.15 governed the limitation on damages, and that the maximum amount recoverable was $2,150,000.

The case was tried in the Circuit Court for Prince George's County over the course of a week in March 2020. While various witnesses, including Ms. Blackston and Dr. Heron, testified, because we must determine where the tort arose, we focus most of our discussion on Ms. Blackston's expert medical witnesses, as their testimony is most germane to the issue of when and where her infection occurred.

### i. Ms. Blackston's expert witnesses

Ms. Blackston called Dr. Praful Ramineni, who was the Chief of Plastic Surgery at WHC and one of Ms. Blackston's treating physicians, to address the standard of care.[7] Dr.

---

[7] Dr. Ramineni has since returned to private practice.

7

Ian Frank, an infectious disease specialist at the University of Pennsylvania, also testified via video deposition as Ms. Blackston's causation expert.

At the outset, Dr. Ramineni opined that Dr. Heron breached the standard of care in several ways, and that those breaches increased the risk that Ms. Blackston would develop an infection. Specifically, he testified that Dr. Heron breached the standard of care by: (1) failing to give an intravenous antibiotic "within 30 minutes to one hour of the procedure"; (2) failing to adequately prepare the skin and take other precautions during the procedure to prevent contamination and bacteria growth; (3) failing to perform the surgery in stages, and instead, continuing the procedure past the recommended six-hour mark; (4) taking numerous breaks during the procedure; and (5) failing to give sufficient post-operative care by (a) continuing the same antibiotic when Ms. Blackston showed signs of infection, and (b) failing to examine her in a timely fashion.

Dr. Ramineni also opined as to when and where Ms. Blackston's infection "started" or "occurred." He explained that "these are deep soft tissue infections . . . not superficial . . . [a]nd [that] the depth of the infections tend to [show] that some have been introduced into the wound itself because it's starting on the inside out, not the outside in." He stated that the type of bacteria present was not the type "you would worry about so much in a postoperative period," and it was introduced sometime during the actual procedure. Dr. Ramineni also specifically opined that the "incident drainage . . . to wash out the multiple different areas that had [an] infection[,]" combined with the "foul smelling" discharge one week after the procedure, were factors that lead him to conclude that the infection "started during Dr. Heron's liposuction procedure[.]"

8

Dr. Ramineni also showed the jury a diagram that described how the liposuction cannulas used during the procedure were the logical source for the introduction of the bacteria into Ms. Blackston's deep tissue. The hollow interior of a cannula, Dr. Ramineni noted, could contain bacteria that would be pushed deep into the tissue throughout the various incision sites. Finally, in Dr. Ramineni's view, as Ms. Blackston's treating physician, the number of required surgeries to remedy Ms. Blackston's *entire* infection was indicative of the number of *individual* infections—which supported the conclusion that the cannulas probing the various incision points were the source of the infection.

Ms. Blackston's other expert witness, Dr. Frank, testified that "the longer the surgery, the more likely infection is going to occur." He opined that Ms. Blackston's infection was "introduced" during the procedure. He testified that "[i]n this particular case, the infection [was] introduced by the [cannulas] that [were] placed" in Ms. Blackston. Dr. Frank noted that there were "multiple infections in the various locations" where the cannulas had been placed. He opined that it was "clear that" the cannulas "introduced the infections in the various locations."

Additionally, Dr. Frank testified that "infections don't manifest themselves immediately after a surgical procedure . . . . [I]t takes some time before you see the signs and symptoms of an infection after a surgery." Notably, he further explained:

> [W]e know, in general, that infections of this type happen at the time of surgery. And, then, specifically, the infection happening in multiple anatomical locations . . . makes it impossible that the infection could have occurred postoperatively. This happened—the infection introduced at the time of surgery. It's the only way all of these different anatomical sites can be infected.

9

Dr. Frank opined that, had Ms. Blackston received an appropriate antibiotic in a timely fashion, she could have avoided hospitalization and the numerous surgeries it took to treat the infection. Dr. Frank testified that, upon seeing that the antibiotic was not working, Dr. Heron should have prescribed Ms. Blackston a different type of antibiotic— one which would have been effective against MRSA.

In addition, Dr. Frank testified that there was some evidence of the presence of an infection during Ms. Blackston's post-operative evaluation on February 3, 2015—less than one week after the surgery. On cross-examination, however, he stated that, based on Dr. Heron's notes from that visit, he could not determine, as a matter of fact, that there were clinical signs of an infection on that date. Although, in his view, Dr. Heron had "poor documentation practice[s]," and from the evidence he reviewed, he could conclusively state that Ms. Blackston's infection was clinically evident by February 7.

### ii. Petitioners' expert witnesses

Petitioners also called two expert medical witnesses during trial, Dr. Eric Neurmberger, an infectious disease doctor from Johns Hopkins, who testified as to causation, and Dr. Jared Mallalieu, a cosmetic surgeon with the Laser Center of Maryland, who testified as to the standard of care. Their testimony, however, offered nothing of import as to *when and where* Ms. Blackston's injury occurred. We briefly summarize their testimony to illustrate this.

Dr. Nuermberger agreed that "MRSA could have gotten deep beneath [Ms. Blackston's] skin . . . if it was pushed there by surgical instruments at the time of the procedure." He could not say to a reasonable degree of medical probability, however,

10

whether Ms. Blackston's infection was seeded during the procedure, or sometime thereafter. He testified that, in his opinion, it was equally possible that the infections in multiple wound sites were developed either during the procedure or sometime thereafter. According to Dr. Nuermberger, a "clear mechanism by which the infection occurred" could not be established. Based on photographs and testimony regarding red swollen skin, by February 7, however, he would assume that the infection had been present for a week.

On cross-examination, Dr. Nuermberger conceded that if Dr. Heron did not decontaminate Ms. Blackston's skin after she took bathroom breaks during the procedure, as Ms. Blackston testified, this would be considered a breach in the standard of care. Dr. Nuermberger disagreed, however, that prescribing a different antibiotic would have prevented Ms. Blackston from undergoing additional surgeries, but he agreed that the antibiotic that Dr. Heron prescribed would not be effective against MRSA.

Petitioners' other expert, Dr. Mallalieu, opined that Dr. Heron complied with the standard of care while treating Ms. Blackston. Specifically, he testified that Dr. Heron adequately obtained Ms. Blackston's informed consent, that his surgical protocols were appropriate, and that he provided appropriate post-operative medical care. Dr. Mallalieu testified that Ms. Blackston was not showing clinical signs of infection on February 3 but agreed that she could have been infected with MRSA as of that date.

### iii. The verdict

At the conclusion of the trial, the jury returned a verdict in favor of Ms. Blackston. On the verdict sheet, the jury was asked to answer whether Dr. Heron breached the standard of care and/or that he failed to obtain informed consent, and, if so, whether either or both

11

of those failures were the cause of Ms. Blackston's injuries. If the jury answered those questions in the affirmative, it was then to assess what damages to award Ms. Blackston, apportioned among medical expenses, economic damages, and non-economic damages. The jury found that Dr. Heron breached the standard of care in treating Ms. Blackston, that he failed to obtain Ms. Blackston's informed consent, and that these breaches were a cause of Ms. Blackston's injuries. The jury awarded Ms. Blackston $2,300,900 in damages: $240,900 in medical expenses, $60,000 in economic damages, and $2,000,000 in non-economic damages.

### iv. Post-trial motions

Petitioners filed an omnibus motion for judgment notwithstanding the verdict ("JNOV"), a conditional new trial, and/or statutory remittitur. Ms. Blackston filed an opposition to the motion.[8]

Ms. Blackston argued that "Virginia substantive law applied" to this case, and, therefore, that Petitioners' motion for statutory remittitur should be denied. She contended that the case had been filed in Maryland because Dr. Heron resides in Prince George's County. She also asserted that the damages cap is a matter of substantive law and that, pursuant to the principle of *lex loci delicti*, the proper law to apply is the law of the place of the wrong—Virginia. Ms. Blackston argued that she was not estopped from relying on Virginia law because the issue of the damages cap was never presented to the jury, and "there is no conflict between Maryland and Virginia law on the liability issues in this

---

[8] We shall focus on only those aspects of the motion and response that are pertinent to the question before us.

case[.]" As it concerns the subject of this appeal, the parties agreed that pursuant to the principle of *lex loci delicti*, the substantive law that would govern any reduction in the jury's damages award was the law of the state in which the wrong occurred. Ms. Blackston asserted that Virginia substantive law governed this case because the place of the wrong was Virginia. At the relevant time, Virginia law placed a cap of $2,150,000 on the total award for medical malpractice claims. *See* Va. Code Ann. § 801-581.15. Petitioners responded that Maryland substantive law governed because Ms. Blackston did not suffer harm until she returned to Maryland, where her symptoms of the infection began manifesting. Petitioners argued that the court should apply Maryland's cap on non-economic damages, which at the relevant time was $755,000. *See* Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-2A-09(b) (1957, 2020 Repl. Vol.).

The circuit court ultimately denied the motions for JNOV and a conditional new trial, finding that Ms. Blackston's "expert was sufficiently qualified and capable of rendering an opinion[,]" and that there was sufficient evidence presented "for the jury to reach its conclusion[.]" The court granted the motion for remittitur in part, applied Maryland's cap on non-economic damages, and reduced the non-economic portion of the award from $2,000,000 to $755,000. In total, the court reduced Ms. Blackston's jury award to $1,055,900.

### 2. The Appellate Court of Maryland

The Appellate Court of Maryland reversed the judgment of the circuit court in an unreported opinion, holding that Virginia's cap on non-economic damages applied. *Blackston v. Drs. Weight Loss Ctrs. Inc.*, No. 553, 2023 WL 4247374, at *9 (Md. App. Ct.

13

June 29, 2023). Specifically, the Appellate Court held that, under our case law, medical negligence arises where the patient is first injured, not where the patient suffers the ultimate damage. *Id.* The Appellate Court observed that Dr. Ramineni and Dr. Frank testified that the infection was introduced during the procedure, while the parties were in Virginia, and the court concluded that because none of Petitioners' experts could definitively state that the infection was introduced elsewhere, Virginia law applied.[9] *Id.* Petitioners filed a petition with this Court for a writ of certiorari, which we granted. *Dr.'s Weight Loss Ctrs., Inc. v. Blackston*, 486 Md. 96 (2023).

### III
### STANDARD OF REVIEW

Choice of law issues are questions of law reviewed by this Court *de novo*. *See Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 619–20 (2007). However, when a choice of law determination depends on a factual finding, we afford deference to the finder of fact. And in so doing, we review the evidence and the inferences reasonably deducible therefrom in the light most favorable to the party who prevailed at trial to determine "whether, viewed in that manner, [they were] legally sufficient to create a triable issue." *Ga.-Pac. Corp. v. Pransky*, 369 Md. 360, 364 (2002) (cleaned up). Further, we resolve contradictions in an

---

[9] The Appellate Court of Maryland also observed that "the injury relating to the failure to give proper informed consent occurred in Virginia, based on the evidence that Ms. Blackston signed the consent form in Dr. Heron's office in Virginia." *Blackston*, 2023 WL 4247374, at *9 n.9. To the extent that the Appellate Court's dicta could be interpreted for the proposition that signing a consent form in Virginia would be sufficient for a determination that her injury arose in Virginia, that would not be accurate. As we discuss herein, the elements for both medical negligence and informed consent require the occurrence of an injury.

14

expert's testimony and between experts in Ms. Blackston's favor as the original prevailing party. *See id.*; *Houston v. Safeway Stores, Inc.*, 346 Md. 503, 521 (1997) (observing that, for appellate review, "this Court must resolve all conflicts in the evidence in favor of the [prevailing party] and must assume the truth of all evidence and inferences as may naturally and legitimately be deduced therefrom" (quoting *Smith v. Bernfeld*, 226 Md. 400, 405 (1961))).

Where the sustainability of all or part of a jury's damages award depends on a factual determination of where the last act giving rise to the tort occurred, the better practice is to submit that factual question to the jury.[10] Here, that issue was not submitted to the jury, neither party requested that it be submitted to the jury, and neither party objected to it not being submitted to the jury. Notwithstanding, $1,094,100 (the amount of the total verdict recoverable under Virginia law ($2,150,000) minus the amount of the total verdict recoverable under Maryland law ($1,055,900)) of the damages awarded by the jury can be sustained only if the tort arose in Virginia; in other words, only if Ms. Blackston sustained her injury in Virginia. As we will discuss, that is a factual issue turning on where and when she developed an infection. In resolving that issue, our focus must remain exclusively on the evidence presented to the jury and whether there was any evidence, however slight, sufficient to sustain the jury's verdict. In addressing that question, we do not weigh that evidence ourselves or look to outside sources or independent knowledge to assess the

---

[10] Here, for example, the verdict sheet could have asked the jury to identify the jurisdiction in which Ms. Blackston first suffered injury as a result of the conduct for which the jury found Dr. Heron liable.

15

veracity or persuasiveness of the evidence.

**IV**
**ANALYSIS**

**A.      *The Doctrine of Lex Loci Delicti and the Restatement (First) of Conflicts of Laws***

To determine which state's substantive law applies, because the case was filed in a Maryland court, we turn to Maryland's choice of law rule, *lex loci delicti*. *Lab'y Corp. of Am. v. Hood*, 395 Md. 608, 615 (2006) ("Maryland continues to adhere generally to the *lex loci delicti* principle in tort cases."). *Lex loci delicti* is Latin for "the law of the place of the wrong[.]" *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citations omitted); *see also Lex Loci Delicti*, Black's Law Dictionary (11th ed. 2019). The source of our choice of law doctrine is the Restatement (First) of Conflict of Laws (1934). The Restatement (First) defines the "place of wrong" as "the state where the last event necessary to make an actor liable for an alleged tort takes place." § 377. Under the doctrine, a court evaluates a party's tort liability according to the law of the place of wrong. *Id.* § 378 ("The law of the place of the wrong determines whether a person has sustained a legal injury."). Stated another way, "when an accident occurs in another state[, the] substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place." *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 745 (2000) (quoting *White v. King*, 244 Md. 348, 352 (1966)).[11]

---

[11] We note that a statutory cap on non-economic damages is a matter of substantive tort law and not procedural law. *See Lewis v. Waletzky*, 422 Md. 647, 662, 664 (2011) (explaining that procedural matters are those that simply affect the administration of justice and "substantive tort law encompasses 'the extent of liability and the right to, and measure of[,] contribution.'" (alteration in original) (quoting *Heffernan*, 399 Md. at 656–57)); *see*

16

When a case's facts concern a single state, *lex loci delicti* is easy to apply. *Id.* But, when the facts concern multiple states, Maryland "appl[ies] the [substantive] law of the [s]tate where the injury—the last event required to constitute the tort—occurred." *Hood*, 395 Md. at 615. For example, as we have previously illustrated, if an individual has an automobile insured with a Maryland-based policy but suffers a motor vehicle accident in Delaware, *lex loci delicti* dictates that Delaware's insurance and automobile law applies instead of Maryland's. *Heffernan*, 399 Md. at 620.[12]

---

*also Heffernan*, 399 Md. at 632–33 (noting that "substantive law [is] to be determined by the place of the wrong, [that] the procedural law [is] to be determined by the law of the forum[,]" and that "the statutory cap on non-economic damages is part of the substantive law of Maryland").

[12] We recognize that no party has asked this Court to reconsider whether adherence to *lex loci delicti* continues to remain sound public policy, and we do not decide that issue today. In fact, both parties agree that the applicable choice of law rule to apply here is the doctrine of *lex loci delicti*. Nonetheless, we recognize that some conflict-of-laws scholars have criticized *lex loci delicti*'s effectiveness. While we continue to use the doctrine for choice of law questions in tort cases, most states have abandoned the Restatement (First)—and by extension *lex loci delicti*—in favor of the "significant contacts" test from the Restatement (Second) of Conflict of Laws. *Hood*, 395 Md. at 615. That test provides several factors that courts consider when determining the proper jurisdiction's law to apply to a tort claim:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

### B.      *The Parties' Contentions*

Petitioners argue that the circuit court correctly determined that Maryland law controls the damages award and that the Appellate Court erred when it held that Virginia law governs the award.  The thrust of Petitioners' argument focuses on the science of bacteria.  In sum, Petitioners assert that when bacteria enter the body, there is a germination period wherein the bacteria grow, multiply, and subsequently reach a threshold, becoming an infection.  Relying on certain portions of the testimony from Ms. Blackston's medical experts, Petitioners contend that while Ms. Blackston was *seeded with bacteria* in Virginia, that bacteria did not manifest into an infection until she was back in Maryland.  Therefore, according to Petitioners, no harm occurred until Ms. Blackston returned to her home in Maryland where the bacteria subsequently reached the threshold of an infection.  Petitioners also argue that, even when bacteria that could give rise to an infection are introduced during surgery, antibiotics can intervene to stop an infection from developing.  It is, thus, the eventual development of the infection that causes injury, not the introduction of bacteria that may or may not result in an infection at a later time.  Finally, Petitioners argue that the entire case, including informed consent, rises and falls on the manifestation of Ms. Blackston's symptoms, which, Petitioners argue, occurred in Maryland.

On the other hand, with respect to her medical negligence claim, Ms. Blackston contends that any harm, no matter how insubstantial, constitutes the injury necessary to complete the tort.  Like Petitioners, she points to testimony from Drs. Ramineni and Frank, each of whom testified that the infection occurred during the procedure, despite her most severe symptoms manifesting later.  Ms. Blackston further contends that, based on the

18

standard of review and the light in which we review the evidence, the expert medical witnesses presented evidence to the jury that could permit the jury to conclude that Ms. Blackston immediately developed an infection during the procedure.

Mindful that we must evaluate the jury's verdict and the evidence upon which it was based in the light most favorable to Ms. Blackston, we shall resolve this case on the evidence presented to the jury. In that respect, the issue for this Court is not to reach its own factual conclusion concerning the medical science of the progress of bacterial infections. Instead, we must confine our review to the evidence that was before the jury.[13] Our reasoning follows.

## C. *Viewed in the Light Most Favorable to Ms. Blackston, the Evidence Was Sufficient to Find that Virginia Was the Place of the Harm*

Ms. Blackston prevailed at trial, where she obtained a jury verdict in her favor. As a result, we view the evidence in the light most favorable to her. *See Pransky*, 369 Md. at 364; *Houston*, 346 Md. at 521.

As discussed, Ms. Blackston sued Petitioners for medical negligence and failing to obtain her informed consent. Both causes of action sound in negligence, but they are distinct claims. *Shannon v. Fusco*, 438 Md. 24, 47–48 (2014) (explaining that the two

---

[13] Significantly, neither party challenged the expert testimony offered by the other on grounds of the reliability of the opinions concerning when an infection occurred. As a result, the circuit court did not have the opportunity to consider whether the medical testimony offered by the experts concerning when the infection occurred met the standard for admission of expert testimony, and we have no opportunity to assess that issue in this appeal.

claims are distinct); *McQuitty v. Spangler*, 410 Md. 1, 18 (2009) (explaining that an informed consent cause of action "sound[s] in negligence").

To prevail in a medical negligence action, "a plaintiff must prove four elements: (1) the defendant's duty based on an applicable standard of care, (2) a breach of that duty, (3) that the breach caused the injury claimed, and (4) damages." *Frankel v. Deane*, 480 Md. 682, 699 (2022) (citation and internal quotations omitted); *see also Am. Radiology Servs., LLC v. Reiss*, 470 Md. 555, 579 (2020).

A cause of action for lack of informed consent contemplates that a "healthcare provider breached a duty to obtain effective consent to a treatment or procedure by failing to divulge information that would be material to [a patient's] decision about whether to submit to, or to continue with, that treatment or procedure." *McQuitty*, 410 Md. at 18-19. To prevail on an informed consent claim, a plaintiff must prove:

> [(1)] the duty to disclose to the patient material information that "a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure"; [(2)] breach of that duty by failing to make an adequate disclosure; and [(3)] that the breach was the proximate cause of the patient's injuries."

*Shannon*, 438 Md. at 45-46 (quoting *Sard v. Hardy*, 281 Md. 432, 444 (1977)). In Maryland's seminal informed consent case, *Sard v. Hardy*, we held "that the causality requirement in cases applying the doctrine of informed consent is to be resolved by an objective test: whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed." 281 Md. at 450.

20

The elements of each tort make clear that both require that the plaintiff have sustained injuries and, therefore, that neither tort is "completed" until the occurrence of an "injury" that is attributable to the defendant's wrongful conduct. *See, e.g.*, *Remsburg v. Montgomery*, 376 Md. 568, 582 (2003) (holding that the plaintiff must prove that they suffered "actual injury or loss" to prevail on a negligence claim); *Shannon*, 438 Md. at 46 (outlining the informed consent elements and explaining that the breach must be "the proximate cause of the patient's injuries"). Thus, critical to resolving the choice of law issue before us is the following question: as to each cause of action, what constitutes a sufficiently cognizable legal "injury"?

In the medical negligence context, we have answered this question on many occasions. In *Green v. North Arundel Hospital Association, Inc.*, we stated that "a cause of action for medical malpractice arises when the plaintiff *first* experiences *any* injury from the allegedly negligent acts of a defendant[.]" 366 Md. 597, 607 (2001) (first emphasis added). In other words, "a medical injury may occur even though all of the resulting damage to the patient has not yet occurred[.]" *Burnside v. Wong*, 412 Md. 180, 200 (2010) (cleaned up). In *Hill v. Fitzgerald*, we explained that "all that is required is that the negligent act be coupled with some harm in order for a legally cognizable wrong—and, therefore injury—to have occurred." 304 Md. 689, 696 (1985); *see also Oxtoby v. McGowan*, 294 Md. 83, 94 (1982) (conceiving "injury" in the context of a progressive illness, ovarian cancer, in terms of "the effect on the recipient in the way of hurt or damage" (citation omitted)). In sum, under our cases, the plaintiff must prove that they suffered "actual injury or loss[.]" *Dehn v. Edgecombe*, 384 Md. 606, 619 (2005) (cleaned up).

21

Although the parties dispute how bacteria and infections fit into these cases, they generally agree that these are the applicable principles.

With respect to the "injury" element of an informed consent claim, we have repeatedly made clear that an informed consent cause of action "sound[s] in negligence[.]" *McQuitty*, 410 Md. at 18; *see also Sard*, 281 Md. at 440 n.4 (noting its "approval of the prevailing view that a cause of action under the informed consent doctrine is properly cast as a tort action for negligence, as opposed to battery or assault."). Because we have couched informed consent in negligence—and not assault or battery[14]—it follows that the kind of "injury" necessary to prevail on an informed consent claim is the same as a medical negligence claim: "actual injury or loss[.]"[15] *Dehn*, 384 Md. at 619.

---

[14] In *Mole v. Jutton*, we distinguished a battery cause of action from an informed consent cause of action. We explained:

> The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. . . . However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence.

381 Md. 27, 47 (2004) (citation omitted).

[15] For this reason, we disagree with Ms. Blackston's assertions that "[e]verything occurring after Dr. Heron elicited [her] informed consent, whether the result of negligence or not, is actionable 'injury' in the eye of the law" and that she "had a[n informed consent] claim from the moment Dr. Heron, after failing to elicit [her]informed consent, began his liposuction procedure and inserted his instruments into her, in Virginia."

Because both torts are not complete until the occurrence of an injury—which is the same for either tort in this case—we do not need to undertake a separate analysis of the medical negligence and informed consent claims for purposes of deciding whether the injury arose in Virginia or Maryland. Based on the expert medical testimony admitted at trial, we hold that there was sufficient evidence for the jury to conclude that Ms. Blackston sustained an injury in the form of an infection in Dr. Heron's Virginia office, where the procedure was performed. Critical to our analysis is the testimony of Drs. Ramineni and Frank. Accordingly, we review their testimony for facts supporting the jury's verdict. *See Pransky*, 369 Md. at 364; *Houston*, 346 Md. at 521. While discussed extensively above, we recount the testimony most pertinent to our analysis.

Dr. Ramineni concluded that the procedure caused the infection, citing the discontinuous nature of the infected incision sites and the depth of the infections as the "basis [for his] opinion that the *infection started* during Dr. Heron's liposuction procedure."[16] (Emphasis added). He even pointed to the source of the infection—the surgical cannulas—and explained, through a diagram, that inserting a cannula would have pushed any bacteria stored in the tool's hollow interior into Ms. Blackston's deep tissue. None of his testimony was challenged based on reliability.[17] And while we are aware that

---

[16] The record reflects that Dr. Ramineni testified four separate times that the infection "started" during the procedure.

[17] Dr. Ramineni's testimony was not challenged based on reliability grounds pursuant to *Rochkind v. Stevenson*, nor was he questioned on cross-examination about his testimony that the infection itself started during the procedure. 471 Md. 1 (2020). We are thus not in position to rule on the appropriateness of letting this evidence go before the

23

Dr. Ramineni was opining on causation, there is sufficient evidence in the record to support the conclusion that, not only was he opining that the infection was caused by the surgery, but also that the infection started during the surgery.[18]

In addition, Dr. Frank testified that this type of infection "happen[s] at the time of surgery." He explained that "[t]his happened – the *infection introduced* at the time of surgery. It's the only way all of these different anatomical sites can be infected."[19] (Emphasis added).

_____

jury. *See id.* at 35–37 (holding that, generally, a trial court must determine the admissibility of scientific evidence employing factors to determine the reliability of the evidence).

[18] During direct examination, Dr. Ramineni was specifically asked:

> Q. And it says, "Multiple sites of surgical infection removable." So, what are they referring to there?
> A. So, the patient had drainage by the trauma surgery service to wash out the multiple different areas that had infections in them. And, so, this is a follow-up visit for that surgical procedure.
> Q. And is that an additional basis for your opinion that the infection was *caused and started* during the liposuction procedure?
> A. Yes. That would be consistent.

(Emphasis added). By specifically answering "[y]es" to whether the infection was "caused *and* started" during the procedure in Virginia, Dr. Ramineni appears to have reached separate conclusions on two separate issues.

[19] Dr. Frank also testified that "[he] think[s] most people will understand that infections don't manifest themselves immediately after a surgical procedure. There's a time that the bacteria need to replicate. There's inflammation that occurs. And, so, it takes some time before you see the signs and symptoms of an infection after a surgery." While this testimony appears to contradict Dr. Frank's other testimony about the infections being "caused . . . during the procedure[,]" our standard of review requires that these contradictions be resolved in Ms. Blackston's favor. *See Pransky*, 369 Md. at 364.

24

Ultimately, based on testimony from Drs. Ramineni and Frank that the infection itself "started" and was "introduced" during the procedure while Ms. Blackston was in Virginia, we agree with the Appellate Court that there is sufficient evidence in the record to support the part of the jury's verdict that is dependent on whether she was injured in Virginia or Maryland. We stress that there was no challenge to the admissibility of that testimony that would permit us to assess its reliability. As a result, the question before us is whether evidence admitted at trial can sustain the jury's verdict, not whether that evidence was correct or scientifically valid. As discussed, the evidence was sufficient.

Therefore, viewed in the light most favorable to Ms. Blackston, we hold that the Appellate Court correctly determined that Virginia substantive law applied to her claim and, therefore, that Virginia's medical malpractice damages cap, rather than Maryland's cap on non-economic damages, applies to the damages award.

## V
## CONCLUSION

We hold that the circuit court erred in applying the Maryland cap on non-economic damages to the damages that the jury awarded to Ms. Blackston. *Lex loci delicti* requires the application of the substantive law of the state where the last element required to complete a tort occurs. Here, two different expert witnesses testified that the infection Ms. Blackston sustained started or was introduced during the procedure in Virginia. The jury was entitled to believe that testimony. Therefore, we agree with the Appellate Court that Ms. Blackston sustained a legally cognizable injury during the surgery in Virginia. Accordingly, viewing the evidence in the light most favorable to her as the prevailing party

at trial, the evidence is sufficient to sustain the part of the jury's verdict that is dependent on the location of her injury. Therefore, the cap on damages under Virginia law, not Maryland law, is applicable to the damages awarded by the jury.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. PETITIONERS TO PAY COSTS.**